Filed 1/17/17

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF
CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JARROD WILLIAMS et al.,<br><br>    Defendants and Appellants. | B259659<br><br>(Los Angeles County<br>Super. Ct. No. BA414878) |


    APPEALS from judgments of the Superior Court of Los Angeles County, Tomson T. Ong, Judge. Affirmed in part and reversed in part.

    Charlotte E. Costan, under appointment by the Court of Appeal, for Defendant and Appellant Jarrod Williams.

    Jennifer A. Mannix, under appointment by the Court of Appeal, for Defendant and Appellant Alphonso Williams.

Joanna McKim, under appointment by the Court of Appeal, for Defendant and Appellant James Wilson.

Verna Wefald, under appointment by the Court of Appeal, for Defendant and Appellant Jonathan Wilson.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Steven D. Matthews, Supervising Deputy Attorney General, and David E. Madeo, Deputy Attorney General, for Plaintiff and Respondent.

_____

A jury convicted Jarrod Williams, Alphonso Williams, James Wilson, and Jonathan Wilson[1] of multiple counts of kidnapping to commit another crime, second degree robbery, kidnapping, and felony false imprisonment, in connection with a series of robberies targeting retail electronics stores. All four appeal, and we affirm in part and reverse in part.

## BACKGROUND

An information filed October 11, 2013 charged Jarrod, Alphonso, James, and Jonathan with 29 counts, including second degree commercial burglary (Pen. Code,[2] § 459), second degree robbery (§ 211), attempted second degree

_____

[1] Jarrod and Alphonso Williams are not related but have the same last name; James and Jonathan Wilson are identical twins. To avoid unnecessary confusion and without intending any disrespect, we refer to the four appellants by their first names.

[2] All further statutory references are to the Penal Code unless otherwise indicated.

2

robbery (§§ 664, 211), kidnapping to commit another crime (§ 209, subd. (b)(1)), and false imprisonment by violence (§ 236), on 10 occasions between April and September 2012. The information named Jarrod in all 29 counts, Alphonso in 19 counts, James in 16 counts, and Jonathan in seven counts. (The information also named another defendant, Mister Johara Richardson, in eight counts, but the jury acquitted him on all counts after trial.)

The charges against Jarrod were commercial burglary (count 1); kidnapping to commit another crime (counts 2, 4, 7, 10, 13, 15, 16, 18, 20, 25); robbery (counts 3, 5, 6, 8, 9, 11, 12, 14, 17, 19, 21, 22, 26, 27); attempted robbery (counts 23, 24); and false imprisonment by violence (counts 28, 29). Two counts, 23 and 24, also alleged that Jarrod was armed with a handgun, and counts 4 through 29 alleged that Jarrod committed the crimes while on bail.

The charges against Alphonso were kidnapping to commit another crime (counts 4, 7, 10, 13, 15, 16, 18, 20, 25), and robbery (counts 5, 6, 8, 9, 11, 12, 14, 17, 19, 21, 22).

The charges against James were kidnapping to commit another crime (counts 7, 10, 13, 15, 16, 18, 20), and robbery (counts 8, 9, 11, 12, 14, 17, 19, 21, 22). Count 15 alleged that James used a deadly weapon, a knife.

The charges against Jonathan were kidnapping to commit another crime (counts 16, 18, 20), and second degree robbery (counts 17, 19, 21, 22.)

All four defendants pleaded not guilty.

3

## I. Prosecution Evidence

### A. *The charged robberies*

The prosecution presented evidence of a series of robberies in 2012[3] at Radio Shacks and cell phone stores, during which multiple robbers pushed store employees into the back rooms of the stores before fleeing with cell phones, cash, and other merchandise.

#### 1. Counts 2 and 3, Riverside, April 25 (robbery and kidnapping) (Jarrod)

The store manager at a Diamond Wireless store in Fontana (where cell phones were kept in a locked cage) testified that a window was smashed sometime after she locked the store and left at 8:45 p.m. on April 24, 2012, but the next day nothing was missing. (The jury acquitted Jarrod of the commercial burglary charge in count 1 regarding this event.)

The night of April 24, Jarrod called Steve Prado, a current employee of the Riverside Diamond Wireless store who used to work with Jarrod at the store in Riverside. Jarrod told Prado he had broken the window at the Fontana store, and offered Prado $3,000 for the key to the merchandise cages at the Riverside store. Prado refused.

The next morning, April 25, at 9:50 a.m., Prado and Monique H. prepared for the 10:00 a.m. opening of the Riverside store. Jarrod texted Prado that he was outside the

---

[3] All subsequent dates refer to the year 2012 unless otherwise indicated.

store.  To discourage Jarrod from robbing the store, Prado replied (falsely) that the district manager was there.  Prado then heard the doorbell ring at the exterior door to the back room and froze, knowing it was Jarrod.

Monique H. opened the door thinking it was a co-worker, and saw a man dressed in black and wearing a ski mask.  Repeatedly saying "shut the fuck up," the man grabbed her, showed her a knife, held it to her neck, and pulled her about 25 feet to a corner of the back room so that she faced the wall.  Prado entered the back room and saw the man with the knife.  A second man whom he recognized as Jarrod knocked Prado to the floor with his forearm.  Having worked with Jarrod also, Monique H. recognized Jarrod's voice.  After a few minutes, the man with the knife ordered Monique H. to lie on the floor face down next to Prado, who was also face down.  Monique H. heard the men taking phones.  The men left the store by the back door (leading to a stairway down to the parking lot) with more than 20 iPhones, each valued at over $500, and a trash can.

A witness, who was sitting in his car in the parking lot near the store waiting for the mall to open, saw two black men, one taller than the other, descend the stairs and walk to a tan vehicle.  They carried merchandise boxes, a trash can, and a white trash bag.  The man who got into the driver's seat wore sunglasses, a grey beanie with tassels, and black gloves with white outlines, like bones.  The witness, who was 10 feet away, saw the face of the other man as he got into the passenger seat, and in a photo lineup identified

that man as Jarrod.  At 9:36 a.m. that day, Jarrod's cell phone (registered to his wife Anisha Williams) had pinged off a cell tower at the mall.

Later that night Jarrod called Prado, who agreed to help him sell the cell phones.  A "fence" paid $19,000, which Prado gave to Jarrod, who then gave Prado $3,000.  Jarrod drove a gold Toyota.  Prado was serving a prison sentence when he testified.

**2.     Counts 4, 5, and 6, Fontana, May 8 (robbery and kidnapping) (Jarrod and Alphonso)**

On May 8, Vanessa Martinez, who was pregnant, worked in the front area of the Diamond Wireless Store in Fontana, which had an all-glass façade bordering the sidewalk.  About 7:00 p.m., she and co-worker Aaron Aguilar observed a dark green Toyota Camry parked backwards, with its windows up and the engine idling.  A few minutes before the 8:00 p.m. closing time, Aguilar walked to the break room in the rear of the store to put on his jacket.

A man wearing a hoodie and a skeleton mask and holding a five- to six-inch kitchen knife and a white trash bag ran into the store.  He approached Martinez, said, "get the fuck up.  This is not a joke.  I'm robbing you," and asked "where is the other guy?"  Grabbing Martinez by the arm, he pushed her about 40 feet to the back of the store, through a door, into a hallway, and into the break room; she was terrified.  Aguilar saw the man open the door to the break room; he was holding the knife to Martinez's stomach.  He told Aguilar not to look at his eyes and to go to the middle of

the conference room/storeroom, about 20 feet farther back (and reachable only by going through the break room). This room contained the vault holding the cell phones. Aguilar thought he recognized the robber's voice, perhaps from company meetings. The man took Aguilar and Martinez to the conference room/storeroom, which could not be seen from the street, and told them to lie face-down, and that if they looked up he would kill them. He demanded their cell phones, and threw them into the breakroom.

Martinez heard a knock at a back entrance, which the man opened to let another man run in. Both men wore hoodies, masks, and gloves; one was taller. Seeming to know where things were, the second man went through the break room into the conference room/storeroom, and took about $33,000 worth of cell phones from the vault (which was left open during store hours). Both men left by the back door. Aguilar locked the front and back doors, pressed the emergency button, and called the police. The car in front of the store had departed.

### 3.    Arrest of Jarrod, May 10

Detectives serving a search warrant on May 9 or 10 noticed a gold 2005 Toyota Camry arrive at Jarrod's home, driven by Jarrod's wife Anisha. Jarrod came out, spoke to Anisha, and returned inside with her. Jarrod and Richardson then came out; Richardson put a plastic bag in the trunk of the Camry, and they drove away. The detectives detained them, opened the trunk, and found in the plastic bag 23 of the 25 items stolen from the Fontana

Diamond Wireless store on May 8, including numerous cell phones and iPads in original boxes. Two beanie caps (one tasseled) and a pair of batting gloves were also recovered from the Camry. A police search of Jarrod's residence discovered four gray hoodies, three beanies, empty electronic boxes, a pair of batting gloves (black with white designs), and a black-handled knife. Martinez identified the knife as the one used in the robbery.

Jarrod was arrested and released on bail on May 11.

**4.  Counts 7, 8, 9, Willow Street/Long Beach, June 19 (robbery and kidnapping) (Jarrod, Alphonso, and James)**

Around 9:00 a.m. on June 19, Jorge Magana arrived for work at a Radio Shack on Willow Street in Long Beach. Through the floor-to-ceiling glass windows at the front of the store, he saw a green Toyota Camry circling the parking lot, driven by a man who looked like the rapper Drake, with two other black people in the car. In court, he identified the driver as Alphonso. A man walked into the store wearing a beanie and gloves, with his face covered and carrying a folding knife which Magana identified as the knife shown in the prosecution's photographic exhibit 4. The man told Magana to lie face-down on the floor "or I'm going to shank you." Magana could see two other men, masked, gloved, and wearing sneakers, enter the store and go to the back room. The first robber told Magana to count to 100. Magana was not sure whether the driver who looked like Drake was one of the three robbers inside the store.

8

The store manager, Juan Mares, had been in the back room on a conference call.  Two robbers entered, grabbed Mares's cell phone, and threw it across the room, where it shattered.  They lifted Mares off his chair by the collar and asked where the high-end phones were, and Mares told them the key to the cage (five feet away) hung on his belt loop.  He opened the cage for the robbers and they pushed him to the ground again; he could feel something hard pressing on the back of his head.  The men tried but failed to disable the surveillance video.  They moved Mares to the far end of the back room (where there was additional merchandise on the wall they did not take), about 50 feet away from his desk, and again put him face down.

The robbers next moved Magana to the back room, then to the middle of the store where they told him to get on the ground again, and then back inside the back room, where no one outside could see him.  The distance they moved Magana to the back room was 40 to 50 feet.  Mares, who was face-down on the floor, could see the robber holding something shiny to Magana's head.  The robber told Magana to go to his knees and then lie face down.  No one outside the store could see the back room and there was no way to escape.  Magana could see them taking merchandise from the cage in the back room (which had been locked).  The robbers also emptied the cash register.  They left by the fire exit after Mares told them how to open it; they instructed Mares and Magana to count to a hundred.  When the robbers were gone, Magana went to the hallway and ran to lock the

front door, and they called the police.  The loss to the store was more than $33,000 in merchandise and $200 in cash.

A half-block from the store, a mailman delivering mail in the area saw a green four-door sedan, parked backwards outside the Radio Shack.  The store door was open, and a black man inside the store passed something to another black man outside, who put it inside the car.  Shortly afterward the car drove past the mailman, and he noticed it did not have a rear license plate.  After he finished deliveries on the block, his next delivery was to the Radio Shack, where he found the front door locked and observed police arrive at the store.

Surveillance video showed the robbery.  Video from the parking lot showed a dark green Toyota Camry (with a rear license plate) stopping in front of the store at about 9:25 a.m.  Feet exited the passenger side and moved toward the store, and the car drove away.  A different light green Camry stopped in front of the store, backed up, and pulled forward.  A backpack recovered from inside the store bore the logo of Alpha Phi Alpha, an historically black fraternity.  Jarrod had a tattoo of the fraternity's Greek letters and logo on the left side of his chest.

Mobile phone records showed that James's cell phone was in the area of the robbery on June 19 and pinged a nearby cell phone tower three times between 8:40 a.m. and 9:22 a.m.

**5. Counts 10, 11, 12, Corona, July 3 (robbery and kidnapping) (Jarrod, Alphonso, and James)**

At 10:30 a.m. on July 3, 2012, John Johnston was helping a customer at a Radio Shack in Corona. Francisco Rodriguez was stocking merchandise. Johnston noticed a green Toyota four-door with no license plate back into a parking stall in front of the store. Three or four black men rushed into the store, disguised with blue hoodies, gloves, and face coverings (a white T-shirt and darker bandannas), and ordered Johnston, Rodriguez, and the customer to lie face down on the floor. They told Johnston to open the safe but he said he had neither the combination nor the keys. The two safes were adjacent to two registers in a circular desk area, and the robbers seemed to know the safes' location.

A robber asked for Rodriguez's store keys, and he took them from around his neck. The robber also asked if Rodriguez had a cell phone, rifled through his pockets when he answered yes, and took it. The robbers locked the front door and told Rodriguez to open the safes, which he did while on his knees. They seemed to know the safes were time delayed.

Telling Johnston to get up, keep his head down, and not to look at them, the robbers pushed him about 40 feet to the back room (which could not be seen from outside), where they made him open boxes of merchandise to look for iPhones. Johnston testified he was afraid for his safety,

because he didn't know what the robbers would do. The robbers asked him if the back door had an alarm, and Johnston told them the door just beeped when it was open, but it was not alarmed. When the robbers finished in the back room they commanded everyone to lie face down and count to a hundred. Video showed a robber opening the cage in the back room and putting phones and other merchandise in a white garbage bag.

Rodriguez testified that at some point while he was lying on the floor by the safes, the store phone rang and the robbers told Rodriguez to pick it up and act "mother fucking happy." Rodriguez told the customer on the phone that the store did not have the part he wanted; he could feel something hard on his back that felt like a knife or a gun. The robbers ordered him back down on the floor and told Rodriguez not to look up and to count loudly to a hundred. While he was counting, Rodriguez heard the back door beep and believed they had exited that way. He got up and went to the back of the store, where he found his cell phone on the floor.

Around 10:40 a.m., Jonathan McConnell tried to enter the store and found the door locked, although merchandise was outside. A black man was leaning against the open trunk of a teal or aquamarine car, which was parked facing away from the store. The man told McConnell that he was airing the trunk out because it smelled like fish, and that a Radio Shack employee had left in a hurry and would be back soon. The man got into the car, did something with his cell

phone, got out of the car, closed the trunk, reentered the car, and pulled around the corner to the rear of the store, popping the trunk. McConnell looked around the building and saw four men, wearing hoodies and with their faces covered, come running out through the back door of the Radio Shack; they carried merchandise to the car. McConnell ran back to his car intending to try to block them. When he pulled up next to the teal car, the driver was looking back, and the left rear passenger took his mask off. The middle passenger took his mask off too, pointed at McConnell, and said something. "They all kind of just looked at me and freaked out, and then they took off." McConnell chased them in his car, but they drove so fast that McConnell could not safely keep up with them. He gave up when they drove erratically, and called 911.

On September 19, 2013, McConnell identified a photograph of Alphonso as the driver, a photograph of James as the left rear passenger, and said a photograph of Jarrod "looked familiar but not positive." At trial, he identified Alphonso and James, and identified Jarrod as the middle rear passenger.

Cell phone records for Jarrod's and James's phones indicated they were in the area near the Radio Shack at the time of the robbery.

### 6. Counts 13, 14, Torrance, July 17 (robbery and kidnapping) (Jarrod, Alphonso, and James)

On July 17, 2012 at 9:20 a.m., assistant manager Tam Doan worked alone inside the Torrance Radio Shack, removing merchandise from the cage in the back room to ship to another store. He heard the front door chime and headed for the front, and in the hallway he encountered three black men wearing gloves and face covers and carrying a bag. Doan dropped the merchandise, and one of the men grabbed his collar and shoved him into the back room, past the cage, and to the rear of the back room, about 40 feet in all. The robbers asked him repeatedly for the combination to the safe, but he told them he did not know it because he was at the store only temporarily. Doan was afraid they might hurt him because he did not have the combination. He gave the robbers his store key, one robber disconnected three of the four surveillance cameras, and they locked the front door. The robbers made him kneel down. One grabbed his collar while the others took merchandise from the cage. At no time could Doan be seen from the outside; he was afraid for his life. The robbers took merchandise worth about $39,000, and around $300 in cash.

The robbers told Doan to lie face down and count to 100. When he finished, he heard the door chime. He waited a few minutes, locked the back door, and called 911. Afterward, Doan was so afraid he was unable to work and

was on workers compensation for a few months after the robbery, during which he saw a psychiatrist.

Surveillance video at 9:20 a.m. that day showed a light green Toyota Camry pull into the parking lot at an angle, and three men get out and enter the Radio Shack. A few minutes later, the car backed up directly in front of the store and the trunk popped open. The robbers came out of the store, put merchandise in the trunk, and got into the car which drove away around 9:36 a.m.

Cell phone records for James Wilson showed he was in the area during the robbery, and Jarrod's phone pinged off a cell tower nearby.

**7.    Count 15, Harbor City, July 30 (kidnapping with knife use) (Jarrod, Alphonso, and James)**

On the evening of July 30, at 9:00 p.m., employee Laniece Renfroe left the Radio Shack store on Sepulveda in Harbor City with her assistant manager Juan Batz. Batz set the alarm and locked the front door. Renfroe got into her car and headed to her father's house in Rancho Palos Verdes. Surveillance video showed a green vehicle and a tan Camry that had been parked nearby following Renfroe. Renfroe stopped for gas nearby, and as she drove on, surveillance video showed the cars still following her. A teal Toyota Camry with a white triangle sticker on the back window kept braking in front of her and then stopped. She slammed on her brakes and put her car in park, which unlocked her doors. A man got out of the teal Camry, banged on Renfroe's

15

window with a grey folding pocket knife in his hand, and told her to open the doors. He opened her back driver's side door and got into the back seat, putting the knife to her throat.

In court, Renfroe at first testified she could not distinguish James and Jonathan. Asked again after a sidebar and a lunch break whether she saw the person who had the knife to her throat, she identified James as the man who entered her car. She had thought about what she said about the skinnier face[4] and had had a better look at the two defendants; she had not spoken to the prosecutor or the detective. Renfroe also identified the knife at trial; it said Smith and Wesson on the back.

James told Renfroe to follow the teal Camry, which had two other men in it. The Camry turned into a school driveway, and James told Renfroe to head back to Sepulveda and Western and lead the way. Her cell phone rang; telling her he would kill her if she answered it, James took her phone and keys. At Sepulveda and Western, the teal Camry got in front of Renfroe again. A gold car that looked just like the Camry followed Renfroe but drove away when she turned onto Western to go to the back alley behind the Radio Shack, where James told her to park. The teal Camry pulled in next to her. James got her out of the car. The driver of the Camry, whom she identified as Alphonso, and the

---

[4] As described below, Renfroe had said earlier when looking at photographs of James and Jonathan that the man who got into her car had a slimmer face.

16

passenger, whom she identified as Jarrod, tried to open the Radio Shack's back door. They told her to open the front door, but she explained she did not have the keys and would have to call her manager. All the men's faces were covered with some kind of shirt from the nose down. They gave her cell phone back and ordered her to call the other man who was with her when she left the store. She called Batz and told him she needed to get back inside the store, but Batz said he was too far away to come back, and she would have to call the manager.

James's cell phone records showed he was in the area of the Radio Shack during the kidnapping, and Jarrod's phone pinged off a nearby cell phone tower at 9:52 p.m.

On January 28, 2013, in photographic lineups, Renfroe identified Alphonso as the driver of the teal Camry, writing: "Driver and I looked eye-to-eye for at least five minutes." She identified Jarrod's voice as that of the organizer, and Jonathan as the robber who held a knife to her neck. Two days later, she wrote under a photo of James: "[I]t could be one or the other. They both look really alike." She said the man who got into her car had a slimmer face, but she still wasn't sure which man it was. At the time James's face was slimmer. When she made the second identification, she did not know that the man she identified earlier had a brother; she just thought they looked similar.

**8. Counts 16, 17, 18, 19, 20, 21, 22, West Covina, July 31 (robbery, kidnapping) (Jarrod, Alphonso, James, and Jonathan)**

On July 31 about 9:30 a.m., Caroline Chavarria and Sergio Garcia worked at separate cash registers in an AT&T store in West Covina. Security guard Teresa Gray had stationed herself in the front of the store, and housekeeper Alma Cruz was cleaning in the back room. Garcia noticed a bluish-green four-door sedan similar to a Camry pull up and block two parking spaces in front of the store. The car doors opened and four black men wearing masks and gloves ran into the store, yelling at Garcia and Chavarria to get face down on the floor. Chavarria testified the robbers told her "not to do anything stupid because I didn't want to get hurt." Both Chavarria and Garcia got down by their registers. Another man wearing a black and white striped sweater stayed by the door. Another man wore a red sweater, and another wore a sweater with red stripes on one arm. One of the robbers went to the break room and told Cruz to get down on the floor, taking her cell phone. The robber with the red striped sweater pushed Gray to the back of the store and into the break room, holding his forearm across her throat. A robber in a red sweater pushed Chavarria by her lower back to the break room, about 50 feet away, and ordered her to lie face down on the floor where Gray was already lying.

A robber wearing a white T-shirt and a beanie, a black and white bandanna, dark shorts, and Air Jordan shoes

lifted Garcia up by his shirt collar and pushed him toward the back.  Garcia heard the front door being locked from inside.  The robbers pushed Garcia face down on the break room floor and asked him, " 'where's the stuff.' "  Garcia pointed to the door between the break room and the vaults.  A robber lifted him up and ordered him to use the code to open the vault door.  They pushed Garcia inside and ordered him to open the safes containing the iPhones and other merchandise, which they subsequently loaded into a big green bag.  They ordered Garcia back to the break room and told everyone to lie down and count to 100.  The robbers removed Garcia's wallet from his back pocket, and took $800 in hundred-dollar bills. The robbers also took cash from the cash safe.

When Chavarria saw on the television showing the store video that the robbers had left the store, they got up, locked the doors, pulled the alarms, and called the police.  Surveillance video showed the robbery, including the robbers loading merchandise into the car.

One of the stolen phones and the stolen cash contained GPS tracking devices.  Responding to a robbery call identifying a light-blue Camry carrying three black men, a police officer spotted the car, and followed it to a parking lot at Cal Poly Pomona.  The car stopped; two passengers fled on foot; the driver stayed in the car.  The police detained both passengers.  A robber wearing a bright red sweatshirt and identified as Jonathan carried $800 in hundred-dollar bills.  The other, later identified as James, wore Jordan

shoes, a white T-shirt, and a dark do-rag, and carried a knife. The driver, later identified as Alphonso, wore a black and white striped sweatshirt. The police brought Chavarria and Garcia to Cal Poly, where they identified the three men as the robbers.

The Camry contained boxes of electronics, six pairs of gloves, a beanie, a bandanna, a gray ski mask, a cell phone, a GPS tracker, and over $3,000 in cash. Alphonso's wallet and driver's license were in the center console. The car was registered to Alphonso's grandfather. Forensic investigators found fingerprints matching Alphonso, Jarrod and Jonathan in the car, and DNA on the gray mask matched Jarrod's. Text messages on Alphonso's cell phone between Alphonso, Jarrod, and James contained messages on June 19, July 3, July 23, July 30, and July 31, discussing dividing up money, scheduling, directions, driving, and pickup. On the dates of the robberies, records reflected significant call activity between Jarrod, Alphonso, and James. Alphonso's and James's phones, and a phone registered to James's wife Anisha, pinged cell towers in the specific robbery vicinities during several of the robberies.

**9. Counts 23, 24, Harbor City, August 29 (attempted robbery) (Jarrod)**

On August 29, Alexis Alvarez and Juan Batz were working at the Harbor City Radio Shack on Sepulveda (the same Batz, and the same store, as was involved in the July 30 kidnapping of Renfroe). About 6:40 p.m., two black men ran into the store wearing cloth masks and gloves; one

20

had a black gun.  The men ordered Alvarez and Batz to the floor and asked who had the keys.  Batz had the keys, and when they told him to lock the door, Batz went to the door but ran out.  One of the men yelled, "'Abort, abort,'" and the other ran to the back.  Alvarez ran out the door and to other stores in the area, and was telling other people what had happened when she saw the two men run out of the Radio Shack with their masks on.  The men got into a small black SUV with a license plate she remembered as 2GCV150 or 6GCV150.

**10.  Counts 25, 26, 27, Willow Street/Long Beach, September 13 (robbery, kidnapping) (Jarrod)**

On September 13 at 8:00 p.m., Ricky Ixtlilco was working at the Willow Street/Long Beach Radio Shack.  He knew about the June 19 robbery at the store and usually kept the front door locked, but after he let in a customer and her daughter, he forgot to relock the door.  Juan Mares, the manager, was counting the money from the cash till in the backroom with the door locked, a precaution after the previous robbery.

At 8:15 p.m., two men entered the store yelling, "'get down to the floor, get down on your stomach, don't look up";  Ixtlilco and the customers obeyed.  The men wore black hoodies and gloves.  The taller one wore a leather face mask and the other a blue bandanna covering his face.  The robber wearing the blue bandanna directed Ixtlilco to walk to the back of the store and lie face-down on the floor.  No one could see Ixtlilco from the street.  The robber took the keys from

21

Ixtlilco's pocket, asked him where the good stuff was, and ran to the back room.  Later, the robbers forced Ixtlilco to return to the counter and lie down near the registers.

Mares heard the second door chime, looked at a video monitor, and saw the robbers grabbing and pushing customers.  He immediately called 911.  A robber wearing a Halloween mask and cargo pants let himself into the back room with keys and asked who was on the phone; Mares said a customer, and hung up.  The 911 operator called back and Mares answered, put the phone on the desk, and got down on the floor.  The robber picked up the phone and went along with the call.  When the robbers heard sirens, they ran around trying to leave, and Mares called 911 again.  One robber ran out the front door and the other ran out the back.  They took $1,300 in cash but left a duffel bag behind.

A police officer saw a suspected robber running out of the back door with something in his hands; the individual was wearing a white hockey-type Halloween mask, a dark hooded sweatshirt, and cargo pants.  The suspect saw the officer and ran into an alley.  Another officer saw Jarrod hunkered down behind a retaining wall a block away from the Radio Shack.  The officer detained him and on the walk to a police vehicle, Jarrod said, " 'Man, I did not use a gun to rob that place.' "  The officer asked him if he had anything illegal, and Jarrod said, " 'Just the money from the Radio Shack.' "  Two rolls of cash were in his pocket.  From the back seat of the police car, Jarrod explained that he had worked at a Radio Shack before, and was trying to help a

friend rob the store; he knew there was money in the register and that Radio Shack kept electronic items in the back. He had planned the robbery just to take cash, but he got greedy and stole stuff from the back. He did not answer and looked away when the officer asked if he had been involved in any other robberies. A second suspect (not one of appellants) was also detained. Shown the detained men, Ixtlilco identified one as the robber with the bandanna, and Mares identified both individuals as the robbers.

### B.    Trial evidence: the investigation

A Long Beach detective investigating the June 19 robbery at the Willow Street/Long Beach Radio Shack learned of similar robberies before and after the June 19 robbery, including one on September 6. The robberies involved common vehicles, including a green or blue Toyota Camry; common methods (wearing gloves, covering the face, ordering the victims to lie face down and count); common victims (Radio Shacks or cell phone stores); and common products stolen (Samsung and Apple). The same methods were commonly used in the large number of robberies of cell phone stores throughout the state.

The detective also investigated the September 13 robbery at the same Radio Shack. In a recorded jail call on September 14, Jarrod called his wife Anisha and told her to pick up her truck at a Long Beach intersection near a Radio Shack, to retrieve his cell phone, and to remove the battery. The detective learned that a black SUV had been used in the Harbor City robbery, and that Anisha was the registered

owner of a black Ford Escape.  In an interview the same day, Jarrod told the detective that the night before he went with his sister's boyfriend to the store, got the keys from another employee, and went into the back, where he found the manager on the phone with the police.  He had no weapons, grabbed the cash and some equipment, exited through the rear door, and ran about a block.  Jarrod claimed it was his first robbery although he had been accused of others.

Jarrod's wife Anisha sold a Camry and bought a 2008 Ford Escape on August 27.

## II.    Defense evidence

### A.    *Jarrod*

Jarrod testified that he had worked at the Riverside Diamond Wireless store and admitted he had worked with Monique H., but insisted he had never seen Aguilar before trial.  Jarrod stored Prado's stolen merchandise in his car as a favor.  Jarrod was in Long Beach for business on June 19; at home in Corona on July 3; in St. Louis for a fraternity reunion on July 30; picking up his paycheck at a shoe store on July 31; and he had been in Alphonso's car a number of times.  He used the ski mask with his DNA on it when the weather was cold.  The fraternity backpack was from a sponsored event and not one he would carry.  Jarrod owned a music management company as well as managed a band.  Alphonso was one of his artists, and he knew Jonathan and James (who was a drummer in the band) from church.  The text messages about money referred to the band, and the texts about time referred to rehearsal schedules.

24

Jarrod described confessing to the September 13 robbery. He said he knew it was wrong, and he was there to help someone out. He denied being anywhere that his cell phone pinged. The Ford Escape with license number 6GBC159 was his wife's car.

### B. *Alphonso*

Alphonso presented testimony that Renfroe told a deputy investigating the July 30 kidnapping that the driver was black, six feet tall, and 160 pounds, but she could not identify any of the men if she saw them again. A coach at Los Angeles Harbor College testified that Alphonso was an assistant coach and was at the college on July 30 from 4:30 p.m. to 7:30 p.m., and thereafter got into his car with a player to drive him home. Alphonso drove his grandfather's green Camry. Alphonso's grandfather Willie Williams testified that Alphonso visited him in the hospital on the morning of July 30 and that he saw Alphonso again at the house (where Alphonso lived with him and his wife) around 7:30 p.m. Alphonso's girlfriend testified that he responded to her on Twitter on July 30 at 9:44 p.m.

Psychologist Dr. Mitchell Eisen testified that human memory is affected by time, and additional information learned later can affect what a person thinks he or she remembers. Stress, trauma, and exposure duration can affect memory, and photographic lineup identifications such as six-packs are not always reliable. Cross-racial identification is more difficult.

### C.  *James*

James's and Jonathan's mother testified that they are identical twins and James is one inch taller and left-handed. She agreed that their voices sound the same, but as their mother she could distinguish them.  James lived with her in July. A cell tower near her home affected reception.  On July 30, James was home all day with his girlfriend, who left at 1:00 a.m.

### D.  *Jonathan*

Jonathan did not testify and presented no evidence.

## III.  Rebuttal

The human resources coordinator for the shoe store where Jarrod worked on Wednesdays testified that he stopped working on April 13, was terminated on May 4, and came into the store for the last time on April 30.

## IV.  Verdicts

The jury found Jarrod not guilty on count 1 (commercial burglary, Fontana, April 24), as well as counts 23 and 24 (attempted robbery, Harbor City, August 29).  The jury found Jarrod guilty as charged on 20 counts (3, 4, 5, 6, 7, 8, 9, 11, 12, 13, 14, 15, 17, 19, 20, 21, 22, 25, 26, 27).  The jury found Jarrod guilty of the lesser offense of false imprisonment by violence (§ 236) on counts 2 and 10; and of the lesser offense of kidnapping (§ 207, subd. (a)) on counts 16 and 18.

The jury found Alphonso not guilty on counts 4, 5, and 6 (robbery and kidnapping, Fontana, May 8).  The jury found Alphonso guilty as charged on counts 8, 9, 11, 12, 14, 15, 17,

19, 21, and 22. The jury found Alphonso guilty of the lesser offense of false imprisonment by violence on counts 7, 10, 13, 16, 18, and 20.

The jury found James guilty as charged on counts 7, 8, 9, 11, 12, 13, 14, 15, 17, 19, 20, 21, and 22. The jury found James guilty of the lesser offense of false imprisonment by violence on count 10, and guilty of the lesser offense of kidnapping on counts 16 and 18. The jury found the knife allegation true.

The jury found Jonathan guilty as charged on counts 17, 19, 20, 21, and 22; and guilty of the lesser offense of kidnapping on counts 16 and 18.

## V. Sentencing

The court sentenced Jarrod to a total term of 69 years to life in state prison; Alphonso to 24 years to life in state prison; James to 48 years four months to life in state prison; and Jonathan to 20 years eight months in state prison. All received presentence custody credits.

All four filed timely appeals. Each appellant joins in the opening briefs of the other.

**DISCUSSION**

**I.    Insufficient evidence supported the convictions for kidnapping to commit robbery and kidnapping, but sufficient evidence supported the convictions for felony false imprisonment.**

> ***A.    Kidnapping to commit robbery (aggravated kidnapping)***

Jarrod, James and Jonathan were convicted of kidnapping to commit another crime (robbery) (aggravated kidnapping), in violation of section 209, subdivision (b)(1) (Jarrod:  counts 4, 7, 13, 20, 25; James:  counts 7, 13, 20; Jonathan:  count 20).  Jarrod, James, and Jonathan argue there was insufficient evidence to support those convictions,[5] and we agree.

On a challenge to the sufficiency of the evidence, our task is to view the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the elements of the crime beyond a reasonable doubt.  (*People v. Young* (2005) 34 Cal.4th 1149, 1175.)  We " ' "presume in support of the judgment the

---

[5] The jury also convicted Jarrod, Alphonso, and James on count 15, kidnapping to commit robbery (Renfroe) on July 30, but appellants do not argue that insufficient evidence supports their convictions on that count.  James includes count 15 in his list of counts of aggravated kidnapping, but argues only that "[a]ll the movements were within the store," and so makes no arguments as to count 15 which took place entirely outside the store.

28

existence of every fact the trier could reasonably deduce from the evidence." ' " (*Ibid.*)

Aggravated kidnapping for the purpose of robbery under section 209, subdivision (b)(1), "requires movement of the victim that is not merely incidental to the commission of the underlying crime and that increases the risk of harm to the victim over and above that necessarily present in the underlying crime itself. [Citations.] 'These two aspects are not mutually exclusive, but interrelated.' [Citation.] [¶] In determining 'whether the movement is merely incidental to the [underlying] crime . . . the jury considers the "scope and nature" of the movement. [Citation. ] This includes the actual distance a victim is moved. However, we have observed that there is no minimum number of feet a defendant must move a victim in order to satisfy the first prong.' [Citations.] [¶] " 'The second prong . . . refers to whether the movement subjects the victim to a substantial increase in risk of harm above and beyond that inherent in [the underlying crime]. [Citations.] This includes consideration of such factors as the decreased likelihood of detection, the danger inherent in a victim's foreseeable attempts to escape, and the attacker's enhanced opportunity to commit additional crimes. [Citations.] The fact that these dangers do not in fact materialize does not, of course, mean that the risk of harm was not increased.' " (*People v. Martinez* (1999) 20 Cal.4th 225, 232–233 (*Martinez*).) "Whether the forced movement of the victim was merely incidental to the target crime, and whether that movement

substantially increased the risk of harm to the victim, 'is difficult to capture in a simple verbal formulation that would apply to all cases.' " (*People v. Curry* (2007) 158 Cal.App.4th 766, 780.)

"[W]hen in the course of a robbery a defendant does no more than move his victim around inside the premises in which he finds him—whether it be a residence . . . or a place of business or other enclosure—his conduct generally will not be deemed to constitute the offense proscribed by section 209. Movement across a room or from one room to another, in short, cannot reasonably be found to be asportation 'into another part of the same county.' (Pen. Code, § 207.)" (*People v. Daniels* (1969) 71 Cal.2d 1119, 1140.) " ' " 'It is a common occurrence in robbery, for example, that the victim be confined briefly at gunpoint or bound and contained, or moved into and left in another room or place.' " [Citation.] Our Supreme Court concluded that "such incidental movements are not of the scope intended by the Legislature in prescribing the asportation element." ' " (*People v. Leavel* (2012) 203 Cal.App.4th 823, 833, citing *People v. Daniels*, *supra*, 71 Cal.2d at p. 1134.) "[T]he *Daniels* court recognized ' "the absurdity of prosecuting for kidnapping in cases where the victim is forced . . . to the back of his store in the course of a robbery." ' Generally, brief movement inside the premises where a robbery is being committed is considered incidental to the crime and does not substantially increase the risk of harm otherwise present." (*People v. Hoard* (2002) 103 Cal.App.4th 599, 603.) "[F]or aggravated kidnapping,

the victim must be forced to move a *substantial distance*, the movement cannot be merely *incidental* to the target crime, and the movement must *substantially increase* the risk of harm to the victim.  Application of these factors in any given case will necessarily depend on the particular facts and context of the case." (*People v. Dominguez* (2006) 39 Cal.4th 1141, 1153.)

Count 4 (Jarrod) charged the aggravated kidnapping of Vanessa Martinez at the Fontana Diamond Wireless Store on May 8.  Martinez was working in the front of the store when a robber ran in, grabbed her by the arm, pushed her 40 feet to the back of the store and into the break room, and then took Martinez about another 20 feet into the conference room/storeroom behind the break room, where Aguilar was.  Aguilar thought he recognized the robber's voice from company training.  The robbers took merchandise from the vault.  The robber moved Martinez a total of 60 feet, from the front of the store to the conference room/storeroom where the unlocked vault containing the merchandise was located.  The conference room could not be seen from the street.

Count 7 (Jarrod and James) charged the aggravated kidnapping of Jorge Magana at the Willow Street/Long Beach Radio Shack on June 19.  Magana was in the front of the store when a robber made him lie down on the floor and two other robbers went to the back room.  Eventually the robbers moved Magana about 40 to 50 feet to the back room, where they took merchandise from the cage.  The robbers also emptied the cash register.

31

Count 13 (Jarrod and James) charged the aggravated kidnapping of Tam Doan at the Torrance Radio Shack on July 17. As Doan headed to the front of the store from the back room, three robbers intercepted him in the hallway. They grabbed Doan's collar, pushed him to the cage in the back room, and then pushed him to the back of the back room, for a total movement of about 40 feet. The back room could not be seen from the street. The robbers took merchandise from the cage.

Count 20 (Jarrod, James, and Jonathan) charged the aggravated kidnapping of Caroline Chavarria at the AT&T store in West Covina. Four men entered the store, and one robber pushed Chavarria to the back of the store to the break room, a distance of about 50 feet from her cash register. The robbers took merchandise from the vaults, reached through a door in the break room.

Count 25 (Jarrod) charged the aggravated kidnapping of Ricky Ixtlilco at the Willow Street/Long Beach Radio Shack on September 13. Two robbers entered; one robber made Ixtlilco walk to the back of the store from the sales floor, where no one could see him from the street. Later, the robbers made him walk back to the counter and lie down near the registers. The cash till was in the back room and Jarrod told police he knew they kept the electronics in the back.

The evidence in each of the five counts on which the jury convicted Jarrod, James, and Jonathan of aggravated kidnapping shows movement of the employee victims

32

distances of 60, 50, and 40 feet, always inside the store, from locations closer to the front of the store (and visible from outside) to the rears of the store or to back rooms, where the merchandise and/or cash was kept. Consistently, these movements were incidental to the robberies, which all followed the same pattern. The robbers entered the stores through the front doors and moved the employee victims to areas closer to the merchandise they planned to take. None of the movements was unnecessary to the robbery. (*People v. Leavel, supra*, 203 Cal.App.4th at p. 835.) "[R]obbery of a business owner or employee includes the risk of movement of the victim to the location of the valuables owned by the business that are held on the business premises. Many retail businesses hold large amounts of cash or other valuable personal property on the business premises, frequently in a secure area away from public view, often in a safe or a vault. . . . The fact thresholds within the business are crossed cannot elevate robbery to aggravated kidnapping, given that all of the movement occurred within close proximity to where the robbery commenced and the only thresholds crossed were those that separated appellants from the . . . property." (*People v. Washington* (2005) 127 Cal.App.4th 290, 300.)

Respondent argues that the backs of the stores were "shielded from view," and thus the movements from "a relatively safe public sales area" put the victims at an increased risk of harm. We disagree. In *People v. Hoard, supra*, 103 Cal.App.4th at page 607, "defendant robbed the

33

jewelry store by forcing the two employees to move about 50 feet to the office at the back of the store.  Confining the women in the back office gave defendant free access to the jewelry and allowed him to conceal the robbery from any entering customers who might have thwarted him. Defendant's movement of the two women served only to facilitate the crime with no other apparent purpose."  (*Ibid*.) While "a rape victim is certainly more at risk when concealed from public view and therefore more vulnerable to attack," the same is not necessarily true for a robbery victim. (*Ibid*.)  In *People v. Leavel*, *supra*, 203 Cal.App.4th at page 836, the court concluded that "forcing the [robbery victim] outside in the dark increased the risk of harm to her from a possible escape attempt," and noted that the defendant "could have secured her in one spot in the home and left her alone while he searched the house and escaped with the loot.  He had no reason to manhandle the [victim] to achieve his robbery objective."  Here, the robbers had good reason to move the victims to the back of the store to achieve their objective of emptying the cages and safes of merchandise without detection by customers or other people outside the store.  Their objective was robbery, not harm to the store employees, and the record does not contain sufficient evidence that moving the victims to the backs of the stores resulted in a substantially increased risk of harm from the robberies.

Thus, the convictions of aggravated kidnapping on the following counts must be reversed:  As to Jarrod, counts 4, 7,

13, 20, and 25; as to James, counts 7, 13, and 20; as to Jonathan, count 20. We therefore need not reach Jonathan's argument that section 209, subdivision (b) is void for vagueness, nor his argument that his life sentence for robbery and aggravated kidnapping is cruel and unusual.

### B. *Lesser included offenses (kidnapping and false imprisonment)*

Each defendant argues that his convictions of kidnapping and/or false imprisonment, which are lesser included offenses of aggravated kidnapping, must also be reversed for insufficient evidence, as follows: Jarrod, counts 16 and 18 (kidnapping) and counts 2 and 10 (false imprisonment); Alphonso, counts 7, 10, 13, 16, 18, 20 (false imprisonment); Jonathan, counts 16 and 18 (kidnapping); and James, counts 16 and 18 (kidnapping) and count 10 (false imprisonment). The defendants moved to dismiss the aggravated kidnapping counts before trial, and the court denied the motions.

### 1. Kidnapping

Section 207, subdivision (a), defines simple kidnapping: "Every person who forcibly, or by any other means of instilling fear, steals or takes, or holds, detains, or arrests any person in this state, and carries the person . . . into another part of the same county, is guilty of kidnapping." The prosecution must prove that the defendant unlawfully moved the victim by the use of physical force or fear, without the person's consent, and the movement was for a substantial distance (the asportation element). (*People v.*

35

*Bell* (2009) 179 Cal.App.4th 428, 435.)  For simple (rather than aggravated) kidnapping, the jury is to " 'consider the totality of the circumstances,' " not simply distance, in deciding whether the movement was substantial.  (*Id.* at p. 436, quoting *Martinez*, *supra*, 20 Cal.4th at p. 236.)  "[I]n a case where the evidence permitted, the jury might properly consider not only the actual distance the victim is moved, but also such factors as whether that movement increased the risk of harm above that which existed prior to the asportation, decreased the likelihood of detection, and increased both the danger inherent in a victim's forseeable attempts to escape and the attacker's enhanced opportunity to commit additional crimes." (*Martinez*, at p. 237.)

Unlike asportation for aggravated kidnapping, asportation for simple kidnapping does not require a finding of "an increase in harm, or any other contextual factors," so long as the victim was moved a substantial distance. (*Martinez*, *supra*, 20 Cal.4th at p. 237.)  However, "in a case involving an associated crime, the jury should be instructed to consider whether the distance a victim was moved was incidental to the commission of that crime in determining the movement's substantiality. . . .  [S]uch consideration is relevant to determining whether more than one crime has been committed, and is amply supported by the case law." (*Ibid.*)  An associated crime for the purposes of simple kidnapping "is *any* criminal act the defendant intends to commit where, in the course of its commission, the defendant also moves a victim by force or fear against his or her will.  It

36

is not more complicated than that." (*People v. Bell*, *supra*, 179 Cal.App.4th 438–439.)

Jarrod, Jonathan, and James were convicted of simple kidnapping of security guard Teresa Gray (count 16) and employee Sergio Garcia (count 18) during the July 31 robbery at the AT&T store in West Covina. Four robbers ran into the store. One pushed Gray, the security guard, from the front to the back of the store and into the break room (about 50 feet), holding his forearm across her throat, and ordered her to lie face down on the floor. Another robber lifted Garcia up by his shirt collar and pushed him from the register in the front of the store to the break room, then to the floor, face down. They next pushed Garcia into the adjoining vault room and ordered him to open the safes. The robbers ordered Garcia back to the break room, told those inside to lie down and count to 100, and left the store. We must determine whether substantial evidence supports the convictions for simple kidnapping with an associated crime, with robbery constituting a criminal act the defendants intended to commit when, in the course of its commission, they forcibly moved Gray and Garcia against their will.

We have already concluded that the asportation of Garcia's colleague Chavarria, whom the robbers also forced from a cash register into the back room about 50 feet away during the July 31 robbery, was insufficient to support convictions of aggravated kidnapping in count 20 because it was within the store and incidental to the robbery. The robbers moved Gray and Garcia roughly the same distance.

37

To determine whether the movement was substantial for the purpose of kidnapping with an associated crime of robbery, we examine whether the distance Gray and Garcia were moved was incidental to the commission of robbery. We again conclude that it was. Both victims were moved from the front of the store to the back room, and Garcia through a door to the vault room, where the robbers took the merchandise from the safes. The movement of Gray and Garcia was merely incidental to the robbery, and was therefore not substantial. The convictions of simple kidnapping on counts 16 and 18 must be reversed as to Jarrod, Jonathan, and James.

### 2. Felony false imprisonment by violence or menace

Section 236 defines false imprisonment as "the unlawful violation of the personal liberty of another." False imprisonment occurs "when 'the victim is "compelled to remain where he does not wish to remain, or to go where he does not wish to go." ' " (*People v. Reed* (2000) 78 Cal.App.4th 274, 280.) False imprisonment is a felony if, as stated in section 237, subdivision (a), "false imprisonment [is] effected by violence [or] menace." Violence is " ' " 'the exercise of physical force used to restrain over and above the force reasonably necessary for such restraint.' " ' " (*Reed*, at p. 280.) " 'Menace' " is defined as ' " 'a threat of harm express or implied by word or act.' " ' " (*Ibid.*) When a defendant ordered his victims to sit and when they resisted, told them " 'If you don't, then I will do something,' " "[t]hese

38

words alone, in context, constituted evidence of an implied, if not express, intent to harm them" and established menace. (*People v. Aispuro* (2007) 157 Cal.App.4th 1509, 1513, criticizing *People v. Matian* (1995) 35 Cal.App.4th 480.) "Threats can be exhibited in a myriad number of ways, verbally and by conduct." (*Ibid.*)

No asportation is required. "[K]idnapping, be it simple or aggravated, requires a degree of asportation not found in the definition of false imprisonment. Indeed, false imprisonment can occur with *any* movement or *no* movement at all." (*People v. Reed, supra*, 78 Cal.App.4th at p. 284.) In *People v. Reed*, the court found sufficient evidence of felony false imprisonment when the robbers directed the victims, at gunpoint, to get down and stay down on the floor; placed the gun against two female victims' heads and pistol-whipped a male victim; and both women believed they would be killed. (*Id.* at p. 281.)

The jury convicted Jarrod of false imprisonment by violence of Monique H. (count 2) during the April 25 robbery at the Diamond Wireless store in Riverside. A robber holding a knife to Monique H.'s throat pulled her to a back room, and a few minutes later, made her lie on the floor face down while he and another robber (whose voice Monique H. recognized as Jarrod) took cell phones. The use of a weapon escalated the force used to more than was reasonably necessary for the restraint, and constitutes sufficient evidence of felony false imprisonment by violence.

The jury convicted Alphonso of false imprisonment by violence of Jorge Magana (count 7) during the June 19 robbery of the Willow Street/Long Beach Radio Shack. A robber holding a knife told Magana to lie face-down on the floor or he would "shank" him. (Alphonso was identified as the driver bringing the robbers to the scene.) The robbers moved Magana to the back room, holding something shiny to his head, and made him lie face down while they took merchandise from the cage. A threat, a knife, and a shiny object held to Magana's head were used to force Magana to the back room and to the floor to stay face-down during the robbery. The use of a weapon and the threat to harm Magana is sufficient evidence of felony false imprisonment by violence or menace.

The jury convicted Jarrod, Alphonso, and James of felony false imprisonment of John Johnston in count 10 during the July 3 robbery at the Corona Radio Shack. Three robbers ran into the store, ordered Johnston to lie face down on the floor, then made him get up and pushed him to the back room where they made him open boxes of merchandise and then again commanded him to lie face down and count to 100. Johnson testified that he feared for his safety. The jury may properly consider fear as evidence of menace. (*People v. Islas* (2012) 210 Cal.App.4th 116, 127.) The jury could reasonably infer that the robbers "coerced [Johnson] into cooperating with their demands through an implied threat of harm" (*id.* at p. 128) when they commanded that he lie down and count to a hundred, with the implication that

40

he would be harmed if he did not remain still for the full count. This constitutes sufficient evidence of menace to support Jarrod's, Alphonso's and James's convictions for felony false imprisonment in count 10.

The jury convicted Alphonso of felony false imprisonment in count 13 (Doan), during the July 17 robbery at the Torrance Radio Shack. Three robbers grabbed Doan's collar and shoved him to the back room, where they made him kneel down, and one held his collar while the others took merchandise from the cage. They then told Doan to lie face down and count to 100, and were gone by the time he finished. As was the case for Johnston in count 10, this constitutes sufficient evidence of menace. The robbers repeatedly asked Doan for the combination (which he did not have), making Doan fear they would hurt him. They then forced Doan to his knees, and one robber held his collar while the others took merchandise from the cage; Doan feared for his life. The robbers ordered him to lie face down and count to 100. Doan completed the count and waited a few minutes before locking the door and calling 911. On this evidence the jury could find implied threats of harm to Doan sufficient to support Alphonso's conviction for felony false imprisonment in count 13.

The jury convicted Alphonso of felony false imprisonment in counts 16 (Gray), 18 (Garcia), and 20 (Chavarria), during the July 31 robbery at the West Covina AT&T store. Four robbers entered the store, and according to Chavarria, said not to do anything stupid if they didn't

41

want to get hurt. The robbers pushed Gray with an arm across her neck, and Garcia by the shirt collar, to the break room, made both lie down on their faces, made Garcia get up to open the vault, stole merchandise, and then forced him back down to the floor face-down and made him count to 100 while they left the store. One of four robbers pushed Chavarria by her lower back to the break room and ordered her to lie face down on the floor while they made Garcia open the safes and took the merchandise, and then told everyone to count to 100. Viewing the evidence in the light most favorable to the prosecution, sufficient evidence showed that the robbers used menace in the form of a threat (made when they entered, and when all three victims were in the front of the store) to hurt the victims if they did anything stupid, to make the victims go to the back room, get down on the floor, and stay face-down while the robberies took place and the robbers left the store. Substantial evidence supported Alphonso's convictions of felony false imprisonment on counts 16, 18, and 20.

## II. Evidence of uncharged robberies was improperly admitted but did not prejudice Jarrod.

Jarrod argues that the trial court improperly admitted into evidence three uncharged robberies (on June 6, August 20, and September 6) which lacked any evidence establishing identity. We agree, but we also find the error harmless.

Alphonso and James objected to the admission into evidence of three robberies not charged in the information,

on the ground that two of the three robberies occurred after July 31, when they were in custody. Jarrod did not object. The trial court denied the objection, stating that identification was not the only issue, but modus operandi was involved: wearing all black and gloves, targeting the end of the day, and moving the individuals from the front to the back of the store to avoid detection. "That goes beyond just the I.D. of the person," and the probative value exceeded the prejudicial effect. Before the testimony regarding the August 20 uncharged robbery, the trial court instructed the jury that events after July 31 had no application to Alphonso, James, or Jonathan.

The prosecution introduced testimony regarding three uncharged robberies. On June 6, at a Radio Shack in Corona, around 9:00 a.m. a tan Camry backed up into a parking spot in front, left the scene, and returned. Two black men got out of the car, and ran in the front door wearing jeans, gloves, hoodies, and bandannas across their faces. One pointed a knife at the store manager and yelled, " 'You know what to do.' " Holding the knife to the back of the manager's neck and telling him that if he did what he was told, he could see his family again, the robber grabbed him by the collar and shoved him to a corner of the back room 40 or 50 feet away. The other robber took the keys to the cages from the manager, and when he found no iPhones, forced the manager to the front of the store to input the code for the safes. The robber then shoved the manager to the back room. The robbers cut the surveillance feed and took

43

the iPhones from the safe, sat the manager at the desk and told him to keep his head down and count to 50, and left the store with approximately $33,000 in merchandise.

On August 20, at 9:00 a.m., a sales associate in the Norco Radio Shack noticed a brown/gold car (shown on video as a tan Camry) in the parking lot driving forward as a young black man carrying a duffel bag and wearing gloves, a bandanna, and a hat came into the store. The young man jumped over the counter, grabbed her shoulder, and asked where the phones were. She told them they were in the back office, and he made her lock the front door and forced her to the back office through a hallway, gripping her shoulder. She unlocked the cabinet door and he told her to go under the desk, lie face down on her stomach, and count to 100. He took merchandise from the cabinet and cash from the cash register, then exited by the back door.

On September 6, about 8:40 p.m., a sales associate at the Atlantic/Long Beach Radio Shack saw two black men enter the store, wearing hoodies and gloves, with bandannas covering their faces. One jumped over the counter, grabbed the back of her neck, and walked her toward the back room where a co-worker was in the restroom. The robbers made her lie down on the ground face-down and then kicked the bathroom door open and made her co-worker lie down next to her. The robbers filled the same bag twice with merchandise, going in and out the back door, and then made her open the safe, from which they took a deposit bag and

more merchandise. They told the employees to count to 100, and walked out the back door.

In closing argument, the prosecutor argued that the uncharged incidents were "there to show you the M.O. . . . Those all show you that they are doing the same thing on prior occasions, and you are allowed to use that to help show you . . . that they did all the other crimes."

Although Jarrod did not object, we retain discretion to review claims affecting his substantial rights. (*In re Sheena K.* (2007) 40 Cal.4th 875, 887, fn. 7.) Evidence Code section 1101, subdivision (a) "prohibits admission of evidence of a person's character, including evidence of character in the form of specific instances of uncharged misconduct, to prove the conduct of that person on a specified occasion." (*People v. Ewoldt* (1994) 7 Cal.4th 380, 393 (*Ewoldt*).) Subdivision (b), however, allows "the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . .) other than his or her disposition to commit such an act." "[E]vidence of a defendant's uncharged misconduct is relevant where the uncharged misconduct and the charged offense are sufficiently similar to support the inference that they are manifestations of a common design or plan." (*Ewoldt*, at pp. 401–402.) " 'Because this type of evidence can be so damaging, "[i]f the connection between the uncharged offense and the ultimate fact in dispute is not clear, the evidence should be excluded." ' " (*People v. Felix*

45

(1993) 14 Cal.App.4th 997, 1004.)  We review for abuse of discretion.  (*Ewoldt,* at p. 405.)

The trial court instructed the jury that they could consider the uncharged crimes to show the defendants' common plan, intent, identity, motive, knowledge, means, or the existence of a conspiracy.  On appeal, respondent argue that "evidence of Jarrod's participation in three additional strikingly similar robberies was admitted . . . to show intent, motive, and common plan."  We must decide whether the uncharged robberies were probative of intent, motive, or common plan, and if so, whether any probative value was outweighed by the robberies' prejudicial impact as character evidence.

The prosecutor presented no evidence of Jarrod's participation in the three uncharged crimes to support their admission into evidence.  None of the witnesses to the uncharged crimes identified Jarrod, or testified to any detail that demonstrated that Jarrod (or any other defendant) participated in the uncharged robberies.  The robberies lack any connection to Jarrod beyond similarity to the crimes for which he was on trial, and they therefore had no probative value regarding his guilt of the charged crimes.

Testimony also established that the elements shared by the charged and uncharged robberies were typical of a large number of robberies statewide.  Detective Donald Collier testified that the charged crimes had common vehicles and a common modus operandi (the robbers wearing gloves, covering the face, having the victims lie face down

46

and count to 50 or 100, targeting Radio Shack or cell phone stores, and taking Apple and Samsung products). He also agreed that the same modus operandi was "a very common practice" in the large number of robberies of cell phone stores throughout California. Such a common statewide pattern is not probative of a common scheme or plan which is detailed or distinctive enough to tend to show a single robber (or robbers) committed all the crimes in this case, whether charged or uncharged. Two of the uncharged robberies involved a tan Camry. A tan Camry was used by the robbers on April 25, Jarrod was arrested in a gold Camry, a gold car was involved in the kidnapping for robbery of Renfroe, and Jarrod's wife sold a Camry on August 27. A Camry or other gold or tan car is not distinctive enough to mandate a conclusion that the uncharged crimes were committed by Jarrod.

Even if the uncharged crimes were similar in every detail and if the details were distinctive, rather than common, the uncharged crimes would have no probative value as to *Jarrod*'s guilt of the charged crimes. "Evidence of a common design or plan is admissible only to establish that the defendant engaged in the conduct alleged to constitute the *charged* offense, not to prove other matters, such as the defendant's intent or *identity* as to the charged offense." (*Ewoldt*, *supra*, 7 Cal.4th at p. 406, italics added.) We repeat that the prosecution did not show any link between Jarrod and the uncharged crimes. Lacking a connection to Jarrod, the uncharged crimes tend to show only that similar crimes

47

had been committed around the same time as the charged crimes for which Jarrod had been charged, but not yet convicted. The evidence would tend to prove only that the same person or persons had committed all the crimes. The evidence would not tend to prove that person was Jarrod. Where "[l]ittle independent evidence was presented that defendant committed the [uncharged] crimes . . . only if the jury found defendant committed the crimes in this case would it find he committed the [uncharged] crimes." (*People v. Carpenter* (1997) 15 Cal.4th 312, 380.) Therein lies the snag.

A brief description of the evidence in cases cited by the court in *Ewoldt*, *supra*, 7 Cal.4th 380 illustrates the circumstances under which uncharged misconduct can be used to show a common design or plan. Where defendant was on trial for the murder of his wife and there was testimony that he and a confederate had killed her to obtain the proceeds of an insurance policy, evidence that three years earlier, the defendant had murdered his former wife (also insured) for financial gain was admissible. (*Id.* at pp. 394–395.) Where a physician defendant was on trial for raping a patient after administering an injection that made her dizzy, the court properly admitted the testimony of two former patients and a former employee stating that the physician had also raped them after he administered injections. (*Id.* at p. 396.) Where the defendant was on trial for murdering two of his wives and his nephew with a lethal dose of insulin, evidence that the defendant had used the

48

same method to murder a third wife, the ex-husband of another wife, and a friend, was admissible " 'to show a common plan or scheme.' " (*Id.* at p. 397.) In *Ewoldt* itself, the court concluded that the trial court did not abuse its discretion in admitting evidence that the defendant, on trial for molesting his young stepdaughters, had molested other stepdaughters in a very similar fashion. (*Id.* at p. 403.) In each case the evidence established that the defendant was the perpetrator of the uncharged crimes, and those crimes were so similar as to show common design or plan with the crimes for which the defendant was on trial. By contrast, here there is no evidence whatsoever that Jarrod was the perpetrator of the uncharged crimes.

The uncharged crimes evidence therefore had little probative value, as it did not link Jarrod with the uncharged crimes. For the same reason, the evidence had little potential for prejudice. " '[C]learly, if the defendant cannot be connected to the prior [uncharged] act, admission of evidence concerning it will not normally prejudice him.' " (*People v. Carpenter*, *supra*, 15 Cal.3d at p. 380.) "Erroneous admission of other crimes evidence is prejudicial if it appears reasonably probable that, absent the error, a result more favorable to the defendant would have been reached." (*People v. Felix*, *supra*, 14 Cal.App.4th at pp. 1007–1008.) The potential for some prejudice arises from the danger that adding three similar uncharged robberies to the 10 charged robberies helped to persuade the jury that Jarrod was guilty of the charged crimes. Nevertheless, we see no reasonable

49

probability that the jury would not have convicted Jarrod if the evidence had been excluded. The evidence against Jarrod in the charged robberies was strong, and it is not reasonably probable that the jury would have acquitted him if the trial court had excluded the evidence of the uncharged crimes.

## III. Renfroe's identification of James's voice was inadmissible hearsay.

Jarrod, Alphonso, and James argue that the trial court erred when it allowed evidence that Renfroe had identified their voices.

Renfroe, the victim in count 15 (July 30, aggravated kidnapping with knife use) testified that six months later in January 2013, she identified Jonathan in a photo lineup as the man who held the knife to her neck in the car. Two days later, shown another photographic lineup, she wrote under a photo of James, "It could be one or the other. They both look really alike" (referring to her earlier identification of Jonathan), and said the one in her car had a thinner face. In a sidebar, the prosecutor stated that Detective Matute had played voice recordings for Renfroe to determine which of the two twins was at the scene. From their voices, Renfroe had identified Alphonso as the driver of the teal Camry, James as the man who got into her car and held the knife to her throat, and Jarrod as the passenger in the Camry.

Alphonso filed a motion to exclude any testimony by Detective Matute that Renfroe had made voice identifications from recordings, arguing that the voice

50

identification procedure was unduly suggestive and Detective Matute's testimony was hearsay. Jarrod and James joined in the objection. The trial court denied the motion, stating that the testimony was not offered for the truth of the matter. Renfroe had already identified Alphonso in a photographic lineup. The sole purpose of the voice lineup was to prove whether Renfroe could distinguish James from his twin Jonathan. The court offered to give a limiting instruction.

Detective Matute testified that after Renfroe was unable to choose between Jonathan and James to make a photo identification of the man who got into her car, he recorded ordinary conversations with all four defendants speaking naturally. He went to Renfroe's house with a partner, and played the recordings to see whether she recognized the voices. She identified Alphonso and Jarrod by their voices, but she did not recognize Jonathan's voice. The minute she heard James's voice, she began to cry and shake: "She said he was the guy that got in the back seat and put the knife to her throat." On cross-examination, Detective Matute refreshed his recollection with the police report, and testified: "She was not sure but thought the voice belonged to the suspect who entered her car." He had not recorded the voice identification procedure and did not keep track of what parts of the recorded conversations he played for Renfroe.

Later, the court instructed the jury: "Remember back Detective Angel Matute was talking about one of the

51

witnesses recognizing a voice? The whole idea behind that was only to distinguish the voice of defendant no. 3, that James Wilson, and defendant no. 4, Jonathan Wilson, if at all. It is not to be considered and not to be held against anybody else. [¶] I know that he has taken the voice of . . . Jarrod Williams and Alphonso Williams. That is not to be held against Williams and Williams whatsoever. You are not to consider that for any other purposes except to distinguish the voice of the two Mr. Wilsons, if it does that at all." After James's mother testified, the trial court repeated the instruction: "Remember Detective Matute was getting voice exemplars from the two Mr. Williams and two Mr. Wilsons. That is not to be used in any way in this particular case and not to be held against Mr. Alphonso Williams or Jarrod Williams. [¶] The whole idea behind that was to see if the witness could distinguish between Mr. Wilson and Mr. Wilson. For the limited purpose that is allowed to be considered if you find it credible. It cannot be used for any other purpose and cannot be held against Mr. Williams and Mr. Williams." When in closing, the prosecutor mentioned that Renfroe had identified Alphonso's voice, the court sustained an objection by Alphonso's lawyer and repeated: "Ladies and gentlemen, you will remember my limiting instruction that the voice identification is solely to distinguish James and Jonathan Wilson. It is not to be attributed to or considered for any purpose as to Jarrod and Alphonso Williams."

James argues that the voice identification procedure was unfair because Renfroe must have known that the recordings were of James and Jonathan and that Detective Matute wanted her to try to distinguish between them. He also contends that Detective Matute should have included additional, unrelated voices, should have played the recordings for Renfroe sooner than six months after the kidnapping, and should have recorded appellants' voices talking like "gangster[s]" as Renfroe testified they did during the crime.

In *People v. Osuna* (1969) 70 Cal.2d 759, the victim testified that he identified the defendant at the district attorney's office by standing outside the door to listen to him talk to the district attorney for 10 or 15 minutes, and then coming in to the office and confronting him. The court concluded that since the victim "had heard the robbers talk for over two hours but had not seen them unmasked, it was reasonable to seek a voice identification." (*Id.* at p. 765.) While it might have been preferable to have the victim hear others speak, "in view of the length of time he was able to hear the robbers talk during the crime, it was not unreasonable to have him confront a single suspect. [Citations.] Moreover, there is nothing in the record to show that the district attorney in any way suggested the response [the victim] should make. . . . [T]he procedure was not so suggestive as to give rise to a substantial likelihood of misidentification." (*Ibid.*)

Here, six months after the crime, Renfroe identified one of the twins (Jonathan) in a photo lineup as the person who entered her car and held a knife to her throat; all the robbers had concealed their faces from the nose down. Two days later, when she saw a photo lineup with James's photo she said it also could be him because they looked so alike. The voice identification, shortly after she identified James, was therefore not unnecessary. The men all were partially masked. Presented with four voice recordings, Renfroe identified the voices of Jarrod and Alphonso. She also failed to recognize Jonathan's voice, but recognized James's. As in *People v. Osuna*, *supra*, 70 Cal.2d 759, she had ample opportunity to hear the voice of the man with the knife who gave her directions from the back seat, and so it was not unreasonable (though not the best practice) not to include other, unrelated voices. As in that case, she identified James's voice from conversation after the crime. It would have been more, rather than less, suggestive to use a recording of James talking like a "gangster" than to present her with James's voice in conversation about unrelated subjects. James makes no argument that Detective Matute suggested how Renfroe should respond. We do not see a substantial likelihood of misidentification.

James also argues that Detective Matute's testimony that Renfroe identified James's voice was inadmissible hearsay because it was offered for its truth, to show that Renfroe identified his voice as the man with the knife. Renfroe had already identified photographs of both Jonathan

54

and James, and said she could not distinguish them, although she thought Jonathan's face was slimmer. Respondent argues that the voice identification was offered only to show that Renfroe could tell their voices apart, and Detective Matute was a percipient witness to Renfroe's identification of James and could testify to the fact of her identification. This contention is disingenuous.

Although Renfroe did not testify regarding the voice identification, she did testify about her earlier identification of first Jonathan and then James in photographic lineups. At trial she was at first unable to say which of the twins was the man with the knife, and after a lunch break said she had gotten a better look, and identified James. The only purpose of the voice identification evidence was to prove that Renfroe recognized James's voice and not Jonathan's *and that James was therefore the man who held the knife to her throat.* There is no meaningful distinction between Renfroe saying that she recognized James's voice and not Jonathan's, and Renfroe saying James, not Jonathan, was the man who held the knife to her throat. Further, Detective Matute testified not that she said they sounded different, but that when she heard James's voice, Renfroe said "he was the guy that got in the back seat and put the knife to her throat." Detective Matute's testimony was hearsay, offered for the truth that Renfroe identified the voice of James, rather than the voice of Jonathan, as belonging to the man with the knife.

The erroneous admission of the hearsay evidence that Renfroe had identified James as the man with the knife by

listening to his voice was clearly prejudicial to James's defense. Renfroe initially identified Jonathan in the photo lineup, and when she later identified James, she said they looked alike and she was not sure which of them held the knife to her neck. At trial, she was unable to choose between Jonathan and James at first, and only chose James after a lunch break. The men had their faces partially covered during the robbery, and Renfroe's inability to choose between identical twins, and her hesitation even at trial, is understandable.

Only Detective Matute's testimony provided an immediate and unequivocal identification of James. The importance of Detective Matute's testimony was highlighted by the instructions given by the trial court to impress upon the jury that they could not use the testimony against Jarrod and Alphonso, whose voices Renfroe also recognized. Three times, the jury heard the court instruct it to use the testimony only to distinguish between James and Jonathan. The sole reason for the jury to distinguish between them was to choose which one had committed the kidnapping in count 15.

It is reasonably possible that the jury would have acquitted James if it had not heard Detective Matute testify that Renfroe immediately and emotionally recognized James's voice as the voice of the man who held the knife to her throat. Renfroe never conclusively identified James in photo lineups, and identified him in court only after first saying she could not tell whether the man with the knife was

56

Jonathan or James.  Without Detective Matute's testimony, it is reasonably possible that the jury would not have concluded beyond a reasonable doubt that James was the man with the knife.

We must reverse James's conviction on count 15.[6]

Jarrod and Alphonso argue that the admission of the voice identification evidence was also reversible error as to each of them.  We disagree.  The same instructions that repeatedly told the jury that they could use the evidence to distinguish between James and Jonathan explicitly forbade them to use the voice identifications against Jarrod and Alphonso.  Assuming as we must that the jury followed those instructions, we see no reasonable possibility that the result as to Jarrod and Alphonso would have been different if the jury had not heard the evidence.  (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1336 (*Seumanu*); *People v. Watson* (1956) 46 Cal.2d 818, 836.)

IV.  **Prosecutorial error or misconduct**

All the appellants argue that prosecutorial error and misconduct deprived them of a fair trial, citing multiple examples regarding the prosecutor's examination of witnesses, her inadvertent placement of her notes on the overhead projector, and her arguments in opening and closing.  We address each in turn and then collectively,

_____

[6] We therefore need not consider James's argument that the trial court erred when it denied his request to allow a voice demonstration by James and Jonathan be played for the jury.

keeping in mind: " ' "A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury." ' " (*Seumanu*, *supra*, 61 Cal.4th at pp. 1331–1332.) The prosecutor's conduct need not be intentional to constitute reversible error. (*People v. Hill* (1998) 17 Cal.4th 800, 822–823.)

"[T]he rule requiring claims of prosecutorial misconduct be preserved for appellate review by a timely and specific objection and request for admonition is well established [citations]. (*Seumanu*, *supra*, 61 Cal.4th at pp. 1340–1341.) " 'The reason for this rule, of course, is that "the trial court should be given an opportunity to correct the abuse and thus, if possible, prevent by suitable instructions the harmful effect upon the minds of the jury." ' " (*Id.* at p. 1341.)

### A. *Cross-examination of Jarrod*

Jarrod testified that the fraternity backpack in evidence (found after the June 19 robbery) was not like the one he would carry, because it came from a sponsored event. During cross-examination, the prosecutor asked him whether the backpack was his, and he said it was not. She then asked, "Why would your wife tell Detective Collier after seeing a photo of that backpack that that backpack was

58

yours?" Jarrod's counsel made a hearsay objection which the court sustained, telling the prosecutor to rephrase the question. She asked whether his wife had seen the backpack and he answered, "She's seen a backpack, yes ma'am." She then asked, "Can you explain why your wife would tell Detective Collier that that backpack that is . . . ," and Jarrod's counsel asked to approach. At sidebar, after argument, the court again ruled the statement by Jarrod's wife (which appeared in the police report) was hearsay.

Asking questions that the prosecutor knows call for inadmissible evidence can be misconduct. (*Seumanu, supra*, 61 Cal.4th at pp. 1348–1349.) As Jarrod's wife declined a defense request to testify at trial, her statement to Detective Collier was inadmissible as hearsay offered for its truth, for the purpose of discrediting Jarrod's testimony that he was not the owner of the backpack. Even assuming the prosecutor committed misconduct by phrasing the question as she did, Jarrod denied it was his backpack, and the prosecutor did not mention the backpack after the court sustained the objection to her rephrased question. The court instructed the jury not to guess what the answer might have been to a question if an objection was sustained, and also: "Do not assume to be true any insinuation suggested by a question asked a witness. A question is not evidence and may be considered only as it helps you to understand the answer." We must assume the jury followed this instruction, and therefore the prosecutor's question was not prejudicial. (*Id.* at p. 1349.)

The prosecutor also asked Jarrod whether his wife had traded in the Camry for a black Ford Escape and he answered yes. The prosecutor then asked, "Your black Ford Escape was seen at the crime scene on August 29th [counts 23 and 24]. Did you loan your car out then?" Jarrod began to answer that the car was not seen that night, and the court interrupted to say, "No, no. You can't argue. That question—the objection is it's argumentative." The prosecutor continued, "Mr. Williams somebody took down a license plate of 6 GBC 150 or 2 GBC 150. Is it just a coincidence. . . ." Jarrod's counsel objected that the question was argumentative and misstated the testimony. The court stated, "Here is the deal. Let's keep it simple. 6 GBC 150, are either of those two license plates to a black Ford Escape owned by you?" Jarrod answered, "Absolutely not." The prosecutor asked, "Is 6 GBC 159 yours?" Jarrod answered, "That's my wife's." Counsel asked to approach and the court responded, "No, we just did. Next." Counsel renewed his objection after Jarrod's testimony ended, arguing that the prosecutor referred to "my client's car having a 6 GBGC 150 or 2 GBC 150 license plate" although when those numbers were run they came back to a black Jeep SUV. The prosecutor responded that the 6 GBC 159 license number of the black Ford Escape was very similar: "The witness got it almost right, and that is what I was referring to." The court construed this and another objection (to the publication of the prosecutor's notes, addressed below) as a motion for mistrial, and denied the motion.

Jarrod argues that the prosecutor knew that the license plate numbers ending in 150 had actually been run and came back to a black Jeep SUV, and committed misconduct in referring to those numbers in her question. We disagree. The prosecutor explained that had she been allowed to finish her question, she would have pointed out that the witness had testified to a number very similar to the license number of the black Ford Escape. She argued in closing that the Ford Escape's license number was close to the number given by the witness. Further, even if misconduct occurred, Jarrod alone was charged in counts 23 and 24 related to the August 29 attempted robbery, and the jury acquitted him on those counts. Clearly, no prejudice occurred.

## B. *Exposing notes to the jury*

At sidebar after Jarrod's testimony, his counsel told the court, "The district attorney published to the jury via the ELMO,[7] her notes, which were typed. These include the sentencing ranges for all these crimes. They include the other information that was not admitted into testimony. They include a telephone number under my name, which belonged to one of the recently retired former heads of the district attorney's office." Alphonso's counsel had advised him of the problem, and Jarrod's counsel immediately picked

---

[7] It appears that Jarrod's counsel referred to the prosecutor's projection onto a screen using an ELMO brand document camera and projection system. (*People v. Centeno* (2014) 60 Cal.4th 659, 665, fn.4.)

it up.  He was "beyond shocked."  He added, "It's not an error that one just does in a brain-dead state."  James's attorney stated that the notes were incriminatory and concerned "pings. "  The prosecutor responded that if she accidentally put her notes on the projector, "none of us saw it," and "I don't know what was on there.  It's all folded up.  It's been in my little purse folded and I was using it to look up the date of the license plate that was found by the witness.  If anybody saw it on the defense, they should have told us."  She added, "It was inadvertent."  The trial court responded that it had looked at the paper.  The telephone numbers were for the defendants' counsel and would not make a difference if the jury saw them.  The summary was not notes, but "a grid of what are the dates and the locations and the charge" which the lawyers might read as sentencing ranges but the jury would not know.  "This is not evidence, and I will give the instruction of what evidence is.  This will not go before the jury.  I'll give the instruction that evidence is something that is marked as evidence."  The court denied the motion for mistrial, told counsel to be more careful around the ELMO, and said, "I don't find anything unfairly prejudicial or that sort.  The jury would have alerted the court."  "It's innocuous."

We granted James's motion to settle the record.  The trial court held a hearing, and a copy of the page placed on the ELMO is in the augmented record on appeal.  The page is a grid organized by six counts and summarizing the evidence for each with "STRENGTHS 1-3 (weak)" at the top.

No sentencing information, and no telephone numbers (except for a fax number at the top of the page), appear. Even if the prosecutor's inadvertent placement of the sheet on the ELMO was error or misconduct, no prejudice resulted as the jury saw no inadmissible evidence.

### C. *Opening and closing argument*

#### 1. Puzzle analogy

In her opening argument, the prosecutor began, "A trial is like a jigsaw puzzle. A jigsaw puzzle, let's say an Eiffel Tower . . . . [¶] The trial will be putting the pieces together. When you have a jigsaw puzzle, you have a box of pieces. They don't go in any particular order. You might look for blue sky to start, and you will see green grass and put that in, and then you go get the blue sky in order. We have over 50 witnesses. We have 29 counts. We have 23 victims. They all can't come in a chronological order. . . . [¶] Once you get all the pieces of a puzzle in about two weeks or so . . . you'll be able to see if it is the Eiffel Tower. You will see the Eiffel Tower even though some pieces might be missing just like from a jigsaw puzzle. You get past two-thirds of it. You say it is the Eiffel Tower. You know what it is. You will know what it is when you get to the end of trial." She concluded, "Ladies and gentlemen, you're going to get pieces of this puzzle in just a minute. You will put them together at the end. When the puzzle comes to light. You'll see not only the Eiffel Tower, but you will see all 29 counts charged to each of these defendants as listed in your grid. That's the evidence upon which you will deliberate." In

closing, the prosecutor argued, "You have at this point all the pieces to the puzzle. You can see that Eiffel Tower. Remember I talked about a jigsaw puzzle four weeks ago. When you [are] making a jigsaw puzzle, you may not have all the pieces, and there's even an instruction you heard yesterday that not all the evidence or witnesses need to come forward, as long as you can see what you have got and you have an Eiffel Tower here." At no time did any defense counsel object.

The appellants now contend that the prosecutor committed misconduct in this portion of the opening and closing arguments by telling the jury that it could find defendants guilty beyond a reasonable doubt if only two-thirds of the evidence supported guilt.

The failure to object forfeited the claim that the prosecutor's argument was improper. "As a general rule, ' "[a] defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion, and on the same ground, the defendant objected to the action and also requested that the jury be admonished to disregard the perceived impropriety." ' " (*People v. Centeno, supra*, 60 Cal.App.4th at p. 674.) Counsel's silence will be excused only if an objection would have been futile, or if an admonition would not have cured the harm caused by the prosecutor's statement. (*Id.* at p. 663.) "A prosecutor's misstatements of law are generally curable by an admonition from the court. [Citation.] . . . [citation]. Nothing in this record indicates that an objection would have been futile.

64

Nor was the prosecutor's argument so extreme or pervasive that a prompt objection and admonition would not have cured the harm." (*Id.* at p. 674.) A defense objection, if sustained, would have given the trial court the opportunity to correct any misunderstanding of the burden of proof the prosecutor may have caused by using the jigsaw puzzle analogy. Defendants have forfeited the issue.

James argues that trial counsel's failure to object constituted ineffective assistance of counsel. To prevail, he must demonstrate that counsel's performance fell below an objective standard of reasonableness, and that there is a reasonable possibility that but for the counsel's errors, the result would have been different. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1126.) "[D]eciding whether to object is inherently tactical, and the failure to object will rarely establish ineffective assistance." (*People v. Hillhouse* (2002) 27 Cal.4th 469, 502.) Further, here the trial court gave proper instructions defining reasonable doubt. We presume the jury followed those instructions, and that no prejudice resulted.

Our Supreme Court has emphasized that the use of "innovative but ill-fated attempts to explain the reasonable doubt standard" by analogies or diagrams presents difficulties, and courts have discouraged their use. (*People v. Centeno, supra,* 60 Cal.4th at p. 667.) For example, when the prosecutor used a slide show to show a puzzle that, after six of eight pieces were in place, was easily recognizable as the Statue of Liberty, the presentation misrepresented the

65

standard of proof by using an iconic image, which invited the jury to jump to a conclusion long before six pieces were in place. (*Id.* at p. 668.) Although the defendants objected and the error was harmless, the appellate court discouraged the use of visual aids. (*Ibid.*) The same impropriety arose when the prosecutor used an image of the shape of California (again, found harmless when the court admonished the jury after objection). "The use of an iconic image like the shape of California or the Statue of Liberty, unrelated to the facts of the case, is a flawed way to demonstrate the process of proving guilt beyond a reasonable doubt. These types of images necessarily draw on the jurors' own knowledge rather than evidence presented at trial. They are immediately recognizable and irrefutable." (*Id.* at p. 669.) It is "misleading to analogize a jury's task to solving a picture puzzle depicting an actual and familiar object unrelated to the evidence." (*Id.* at p. 670.)

Although the prosecutor here did not project a graphic image of the Eiffel Tower, and did not tell the jury she was defining reasonable doubt, her verbal description asked the jurors to imagine a similarly iconic image which risked misleading the jury about the standard of proof. Although the failure to object forfeited the issue, we strongly discourage such practice.

### 2. False argument

In closing, James's counsel stated, "So did he do that? Yes," regarding the July 31 incident (for which James was arrested, and was charged with four counts of robbery), and

argued that the issue was whether the prosecution had proven kidnapping for robbery. James's counsel also argued that the jury could not jump to the conclusion that James was involved in the other robberies. Jonathan's counsel stated, "[A]cknowledging and respecting your collective intelligence and street smarts, Mr. Jonathan Wilson will not dispute the charges of robbery in this case. Not whatsoever," and proceeded to argue that no kidnapping occurred during the July 31 robbery (the sole incident charged against Jonathan, with four counts of robbery). Alphonso's counsel stated: "I'm not going to sit here and insult your intelligence and say these aren't robberies," but challenged the evidence identifying Alphonso. Counsel for two of the four defendants, James and Jonathan, conceded that their respective clients were guilty of robbery on July 31.

In her rebuttal, the prosecutor stated, "Let's go to James. Okay. Okay. You notice the defense attorneys have all admitted that they are guilty of robbery. So that's 18 counts. You're done. You don't have to spend much time on that . . . ." The defendants moved for mistrial regarding this "active misrepresentation of . . . all those positions of all these defendants." The trial court denied the motion. "[W]ith respect to . . . [¶] . . . the misrepresentation of not contesting to certain facts, you know that is the art of advocacy. What one person may think is contested, another person may think is conceding. . . . [The prosecutor] did that, and I think that's fair argument."

The prosecutor's argument, made after she referred to James, overreached by stating "all" defense attorneys admitted their clients were guilty of robbery and that 18 counts were therefore easy for the jury. In light of the entire lengthy closing arguments, however, we see no possibility that the statement justified a mistrial, given that two defendants, James and Jonathan, each admitted to four counts of robbery, and the prosecutor also argued forcefully that the identifications and other evidence placed all the defendants at the scenes of all the robberies charged.

### 3.    Impugning the integrity of defense counsel

In closing argument, the prosecutor pointed out that Jarrod had testified he attended Bible study on Wednesday nights while the evidence showed he was at work, adding: "So whatever they said and whatever their lawyers argue in a few minutes take it with a grain of salt." The prosecutor referenced a jury instruction that a witness who testified falsely should be distrusted in all of their testimony.

Jarrod's counsel objected and asked for a mistrial, and all counsel joined. The prosecutor stated that in saying "grain of salt" she had not meant to infer that the defense lawyers were not to be believed. The trial court denied the motion for mistrial, stating that "[t]he comment about liars was as to your client Jarrod Williams," and the comments of lawyers were not evidence.

We agree that in context the comment referred to Jarrod and so did not tell the jury that the lawyers were

liars, and it was not an abuse of discretion to deny the motion for mistrial. While consistent denigration of defense counsel is improper, the prosecutor's single remark was "clearly recognizable as an advocate's hyperbole" regarding discrepancies in Jarrod's testimony and was a small part of a very lengthy argument. Therefore, it is not reasonably probable the comment influenced the result. (*People v. Sandoval* (1992) 4 Cal.4th 155, 184.)

### 4. Shifting the burden of proof

At the end of her rebuttal argument, the prosecutor claimed that defense counsel did not have the facts or the law on their side and instead "just argued. The defense never came up with one fact that disproved they are not part of these robbery kidnappings." Defense counsel did not include this comment in their motion for mistrial. This failure to object forfeits defendants' claim on appeal that the prosecutor told the jury that they had to offer evidence to disprove their guilt, rather than properly allocating the burden of proof to the prosecution.

The prosecutor's statement could, however, be considered a misstatement of the law, implying that she did not have the burden of proving every element of all the charged crimes by a reasonable doubt, and insinuating that the defense had to produce some affirmative evidence to raise a reasonable doubt in the jury's mind. (*People v. Hill* (1998) 17 Cal.4th 800, 831–832.) "On the other hand, [the prosecutor] may . . . have been exhorting the jury to consider the evidence presented, and not attorney argument, before

69

making up its mind." (*Id.* at p. 832.) The jury instructions properly stated that that the burden of proof was on the prosecutor. Because a timely objection and admonition would have cured any remaining prejudicial confusion, the failure to object waives a claim of misconduct. (*People v. Gonzalez* (1990) 51 Cal.3d 1179, 1215.)

James argues that counsel's failure to object to the prosecutor's statement constituted ineffective assistance. We presume, however, that the jury followed the court's instructions, which properly explained that the prosecution had the burden of proof. Even if the failure to object to the prosecutor's statement fell below an objective standard of reasonableness, there is no reasonable possibility that but for counsel's silence, the result would have been different. (*People v. Rodrigues*, *supra*, 8 Cal.4th at 1126.)

### 5. Misstating the law of aggravated kidnapping

The court instructed the jury with CALJIC No. 9.50.1, which stated that to determine whether a defendant moved a victim a substantial distance and substantially increased the risk of harm, the jury was to consider the scope and nature of the movement and its environment, including whether the movement decreased the likelihood of detention, decreased the likelihood of detection, increased the danger inherent in foreseeable attempts to escape, or enhanced the opportunity to commit other crimes. The court also gave CALJIC No. 9.54, which stated that brief movements to facilitate the crime of robbery were merely incidental to the robbery. In

70

closing, the prosecutor put on the board what she represented to be instructions, including cited cases that removing a victim out of public view could be substantial movement that increased the risk of harm, even if it was from the front to the back of the store, and if the victim might less easily sound an alarm. Counsel objected that the cases were inapplicable, as they involved kidnapping for rape. The trial court denied the defense motion for mistrial on this basis: "If there is a discrepancy between the law that is given by Ms. Rose and law given by the court, it is the law by the court that governs. And I have instructed the jury on that."

The cited cases in the description shown to the jury did involve kidnapping to commit rape, not robbery. As we have stated above, while a rape victim is more at risk and more vulnerable to attack if concealed from public view, the same is not necessarily true for a robbery victim. (*People v. Hoard*, *supra*, 103 Cal.App.4th at p. 607.) "Where a defendant drags a victim to another place, and then attempts a rape, the jury may reasonably infer that the movement was neither part of nor necessary to the rape," and that the movement was therefore was not incidental to the rape, justifying a conviction of aggravated kidnapping. (*People v. Shadden* (2001) 93 Cal.App.4th 164, 169.) By contrast (as we also stated above), in the case of a robbery, movement from the front of the store to the back area away from public view cannot elevate robbery to aggravated kidnapping where the thresholds crossed (as in the robberies

71

in this case) separated the defendants from the property. (*People v. Washington*, *supra*, 127 Cal.App.4th at p. 300.) The prosecutor displayed to the jury descriptions of kidnapping for robbery that, based as they were on cases involving kidnapping for rape, misstated what movement would be substantial enough to increase the risk of harm to the victim.

The prosecutor's argument misstated the relevant law by substituting the standard for kidnapping for rape, under which a jury would be more likely to convict the defendants for movements like the ones in the robberies charged here, from the fronts to the backs of the stores, to a place out of public view. The jury did convict Jarrod, James, and Jonathan of kidnapping for robbery, and we have reversed those convictions, concluding that the evidence was insufficient under the correct definition of the crime. The difference between the two standards mattered in this case, and the trial court should have admonished the jury that the prosecutor had misstated the law of aggravated kidnapping for robbery. Nevertheless, the trial court gave the jury correct instructions on kidnapping for robbery. Further, we reverse the aggravated robbery convictions for insufficient evidence under the proper standard.

The conduct by the prosecutor which the defendants preserved for appeal by properly objecting, whether considered individually or cumulatively, did not deny the defendants a fair trial.

## V. Judicial misconduct

Defendants, citing multiple examples, argue the trial court committed misconduct by acting as an advocate for the prosecution when the court posed its own questions to witnesses, citing multiple examples. We describe each instance in chronological order, and then consider whether the trial court's questioning improperly conveyed that it was partial to the prosecution.

### A. Trial court statements

#### 1. Cross-examination of Magana

Magana testified that on the morning of the Willow Street/Long Beach robbery on June 19 he saw a green Camry circling the parking lot, driven by a man who looked like the rapper Drake, and identified the driver as Alphonso. On cross-examination, Alphonso's counsel asked, "This rapper Drake, he's actually light-skinned, right?" The prosecutor objected, and the court stated, "That is a matter of perspective. Compared to you, he would be dark." Counsel continued, "But compared to the defendants here, compared to Mr. Wilson over there on the left wearing the burgundy shirt, he's lighter skinned than that?" The prosecutor again objected that the question was not relevant, and counsel responded that it went to identification; the prosecutor pointed out that it was two years later. The court intervened, "Let's cut to the chase. Okay. [¶] Did the guy that looked like Drake—okay. Was he—did he look like an African-American man?" Magana answered yes. The court continued, "Kind of like the same color, same haircut, same

73

features?" Magana answered, "He even had—I don't know what you would say, a goatee." The court said, "There you go, a goatee. That's the description that you get. We're not going to go through the—" Counsel went on, "Does Drake have a goatee? Is that what you said?" Magana answered, "Sometimes."

Alphonso's counsel asked Magana if during his earlier identification of exhibit 4 as the knife used in the robbery, he had recognized the knife by the holes in its handle, and he said yes. Counsel asked, "You see on the knife there where it says Smith and Wesson?" The court told counsel "[b]efore you do that, foundation," and asked if Magana remembered seeing a Smith and Wesson brand name. Counsel said, "That's what I was getting to if you let me," and then asked Magana whether he remembered seeing the brand name on the knife blade. The prosecutor objected that Magana had said he did not see it, and counsel responded, "That's what I said." The court admonished the prosecutor not to make a speaking objection, and told counsel to keep the question simple. The court asked Magana, "When the knife was pointed to you, were you looking at the brand name?" and Magana answered, "No." Counsel asked Magana if he should have seen the brand name. The court sustained an objection to the question, and asked Magana how long he observed the knife pointed at him. Magana answered, "Not very long, your honor. I was scared."

### 2. Cross-examination of Detective Matute

During Alphonso's counsel's cross-examination of Detective Matute regarding Renfroe's voice identification, the court intervened ("[l]et me clear this up"), and asked a series of questions to clarify when the voice identification had taken place and how Detective Matute had conducted the identifications. The questions resulted in testimony that Renfroe had identified Alphonso, Jarrod's, and James's voices and had not identified Jonathan's, and the court then concluded: "There you go. [¶] Next." When counsel established that Detective Matute played only one voice recording at a time, and then asked Detective Matute if showing a victim one photograph in a photographic lineup would be unduly suggestive, the court reminded counsel that a photographic lineup was not similar to a voice identification and told counsel to move on.

When counsel for James cross-examined Matute about showing Renfroe two six-pack photographic identification to distinguish between Jonathan and James after the voice identification, counsel asked whether Detective Matute could have arranged a live lineup and the detective said that was an option. The court asked, "[D]id any of the attorneys, including the defense attorneys, ask for a live line-up in this case?" Detective Matute answered that they did not. The court continued to ask whether Detective Matute, the prosecutor, or any of the defense attorneys could have asked for a lineup, and whether any of them did, and Detective Matute answered no.

75

James's counsel moved for a mistrial joined by all defense counsel, arguing that asking whether the defense had asked for a live lineup of James and Jonathan could lead the jury to think "[p]erhaps the judge is taking sides." The trial court denied the motion, stating that the questions merely clarified that anyone, including the prosecution, could ask for a live lineup. "If we're searching for the truth in a trial, it is not gamesmanship; Oh, he didn't ask for a line-up; therefore, it is this person's fault or that person's fault. [¶] Everyone is entitled to ask for a line-up. So that was clarified to the jury . . . . None of them asked for one."

### 3.  Examination of Dr. Eisen

Alphonso's counsel questioned Dr. Eisen, the defense expert on how memory works, about a person's ability to make a cross-racial identification. The court asked, "Does that really work, doc, cross-racial?" Dr. Eisen responded that it was more difficult to differentiate faces from a different race. The court asked whether "it's like saying that all Asians look alike," and Dr. Eisen agreed. The trial court then said, "Let me give you the challenge," and asked that if he was from all-white "Podunk, Alabama," and saw "one Asian dude doing something. . . . Do all Asians look alike to all people that have not seen an Asian?" Dr. Eisen responded that the identification should not be difficult in that situation. The court asked whether cross-racial difficulties applied where "[w]e are the melting pot of the world," and Dr. Eisen answered that he saw cross-race

76

effects in his laboratory at Cal State Los Angeles: "We get cross-racial effects, that's not as powerful as Podunk."

On cross-examination by James's counsel, Dr. Eisen discussed research that once a witness identified a suspect's photograph, it was difficult later to back off the identification. The court asked, "[If] somebody makes identification and subsequently says I'm not so sure and reaffirms that identification subsequent, does that make the identification stronger, weaker or the same?" Dr. Eisen answered, "Actually, it's all just data."

### B. Analysis

Appellants argue that the trial court's manner when it participated in, and initiated, the questioning of witnesses conveyed to the jury that it was aligned with the prosecution, and minimized the credibility of the defense.

A trial court may control the examination of witnesses with the goal of ascertaining the truth, and may examine witnesses on its own motion. (§ 1044; Evid. Code, §§ 765, subd. (a), 775.) " '[I]t is not merely the right but the duty of a trial judge to see that the evidence is fully developed before the trier of fact and to assure that ambiguities and conflicts in the evidence are resolved insofar as possible.' " (*People v. Mayfield* (1997) 14 Cal.4th 668, 739.) The court has the power and the duty to question witnesses in an effort to elicit material facts or to clarify confusing testimony. (*People v. Cook* (2006) 39 Cal.4th 566, 597.) Nevertheless, jurors rely on the fairness of judges, and if the trial court makes discourteous and disparaging remarks to defense counsel

77

and witnesses " 'so as to discredit the defense or create the impression that it is allying itself with the prosecution,' " the resulting lack of judicial fairness requires a new trial. (*People v. Sturm* (2006) 37 Cal.4th 1218, 1233.)

Failure to object to the trial court's remarks ordinarily forfeits a claim of judicial misconduct on appeal, unless objection could not have cured the prejudice or would have been futile. (*People v. Houston* (2012) 54 Cal.4th 1186, 1220.) Here, the sole objection made was the motion for mistrial after the cross-examination of Detective Matute. While a defendant's failure to object will not forfeit a claim of misconduct if the hostility of the court is evident, or the court has made extensive, numerous disparaging remarks (*ibid.*), such is not the case here.

During defense cross-examination of Detective Matute, the court intervened to clarify that no party requested a live lineup for Renfroe to identify her kidnappers. It was not an abuse of discretion to deny a motion for mistrial based on that objected-to conduct by the court.

Further, if we were to consider all the court's remarks on the merits, the trial court did not commit misconduct. While the court actively managed the testimony and was occasionally abrupt and impatient with defense counsel, it did not disparage counsel. Our reading of the trial transcript shows that the court also repeatedly admonished the prosecutor to "cut to the chase" and "move on," and did not hesitate to intervene in questioning to clarify witness testimony favorable to the defense. In managing five

78

defense counsel and a prosecutor over the long trial, the court's interventions and questioning were not so extreme and one-sided as to convey to the jury that the court was partial to the prosecution. The trial court did not "deviate[] so far from its duty to conduct [the] jury trial in a fair and impartial manner as to require reversal of the conviction." (*People v. Santana* (2000) 80 Cal.App.4th 1194, 1209.)

We have found that insufficient evidence supports a number of the defendants' convictions for aggravated kidnapping and kidnapping. As to their other claims of error, we see no cumulative error sufficient to require us to reverse the convictions that remain.

## VI. Sentencing issues

### A. *False imprisonment and section 654*

Jarrod, Alphonso, and James argue that the trial court erred in refusing to stay their sentences for false imprisonment under section 654, as the false imprisonment in each count (counts 2, 7, 10, 13, 16, 18, and 20) was indivisible from and part of the robberies and pursuant to a single objective.

Alphonso argued in his sentencing memorandum that section 654 applied. At sentencing, the trial court did not address the section 654 issue, imposing eight months for each false imprisonment conviction, and running each such sentence consecutive to the second degree robbery convictions. Nevertheless, where there is no express discussion of section 654 on the record, a finding that the

79

crimes were divisible is inherent in the judgment. (*People v. Latimer* (1993) 5 Cal.4th 1203, 1208.)

Section 654 "generally precludes multiple punishments for a *single physical act* that violates different provisions of law [citation] as well as multiple punishments for an *indivisible course of conduct* that violates more than one criminal statute." (*People v. Newman* (2015) 238 Cal.App.4th 103, 111–112.) Section 654 does not bar multiple punishments for an act of violence against multiple victims, or if during a course of conduct, "the defendant ' "entertained multiple criminal objectives which were independent of and not merely incidental to each other." ' [Citation.] The application of this second exception ' " 'depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one.' " ' " (*Id.* at p. 112; *Neal v. State of California* (1960) 55 Cal.2d 11, 19.)

Section 654 bars multiple punishment for separate offenses arising out of a single occurrence where all of the offenses were incident to one objective. Here, the false imprisonment and the robberies of each victim in counts 2, 7, 10, 13, 16, 18, and 20 were an indivisible course of conduct committed "pursuant to a single intent or objective," that is, to rob the victims of the cell phones, cash, and other merchandise in the back rooms of the stores. (*People v. Beamon* (1973) 8 Cal.3d 625, 639.) In *People v. Newman, supra,* 238 Cal.App.4th 103, the false imprisonment charges

80

were based on the robber's turning and pointing his gun at customers trying to leave the restaurant and yelling that no one should move, which constituted a separate criminal objective from the robbery of the restaurant cashier and justified separate punishment.  (*Id.* at pp. 106, 112–113.)  In this case, in count 2, Jarrod's fellow robber ordered Monique H. to lie face down next to Prado in the back room, from which the men took phones and left the store.  In count 7, a robber forced Magana to the back room, where they made him lie face down while they took merchandise from the cage.  In count 10, robbers forced Johnson to the back room, where they made him open boxes of merchandise, took merchandise from the cage, and commanded him to lie down and count to 100.  In count 13, robbers shoved Doan to the back room and repeatedly demanded a combination which he did not have; they made Doan kneel and held his collar while they stole merchandise from the cage, and then told him to lie face down and count to 100.  In counts 16, 18, and 20, robbers including Alphonso pushed Gray, Garcia, and Chavarria to the break room and ordered them to lie down and count to 100 while the robbers took phones and cash from the safes in the vault and robbed Garcia of his wallet and $800.  The false imprisonments were part of an indivisible course of conduct with the objective of robbery of merchandise from the backs of the store.

Accordingly, the sentences for the false imprisonment convictions on count 2 (Jarrod), count 7 (Alphonso), count 10 (Jarrod, Alphonso, and James), count 13 (Alphonso), and

counts 16, 18, and 20 (Alphonso) must be stayed pursuant to section 654.

### B. *Restitution amount*

Alphonso and James contend that the trial court erred in ordering them to pay restitution related to the Riverside Diamond Wireless robbery on April 25 (counts 2 and 3) and the Fontana Diamond Wireless robbery on May 8 (counts 4, 5, and 6). The information did not charge Alphonso or James in count 2; James was not charged in counts 4, 5, and 6, and the jury acquitted Alphonso on those counts.

At his sentencing hearing, Alphonso stipulated to a total amount of restitution after reviewing with his counsel some paperwork provided by the prosecutor. The paperwork does not appear in the record. The trial court ordered Alphonso to pay total restitution of $140,556.84, which included $43,416.09 to Verizon Wireless and $1,179.77 to Diamond Wireless. At James's sentencing hearing, the court asked, "Is the defendant stipulating to restitution?" and counsel answered, "Yes." The court then ordered James to pay "Verizon Wireless for the April 25th, robbery and kidnapping $43,416.09.[8] [¶] Diamond Wireless for the May 8th, robbery and kidnapping $1.179.77," along with

---

[8] Respondent acknowledges that the April 25 robbery occurred not at a Verizon store but at the Diamond Wireless in Riverside. On remand, the trial court must correct the restitution order to reflect the correct recipient of restitution for the April 25 robbery.

other amounts, for the same total restitution amount of $140,556.84.

We quickly dispose of respondent's argument that Alphonso and James forfeited any objection to restitution by stipulating to the restitution amount. "Factual issues may be subject to the waiver rule, but an objection may be raised for the first time on appeal where it concerns an 'unauthorized' sentence, i.e., one that 'could not lawfully be imposed under any circumstance in the particular case.' " (*People v. Percelle* (2005) 126 Cal.App.4th 164, 179.) They have not forfeited the purely legal issue whether the court imposed the restitution order in excess of its statutory authority. (*Ibid.*)

We review the trial court's order of restitution for an abuse of discretion. (*People v. Foalima* (2015) 239 Cal.App.4th 1376, 1395.) The trial court abused its discretion when it ordered Alphonso and James to pay restitution for crimes with which they were not charged or crimes of which they were acquitted. "[S]ection 1202.4 . . . limit[s] restitution awards to those losses arising out of the criminal activity *that formed the basis of the conviction.*" (*People v. Woods* (2008) 161 Cal.App.4th 1045, 1049, italics added.) Section 1202.4, subdivision (f) provides for restitution when a victim suffered economic loss " ' "*as a result of the defendant's criminal conduct. . . .*" [T]he term "criminal conduct" as used in subdivision (f) means the criminal conduct for which the defendant has been convicted.' " (*Ibid.*) A restitution order is not authorized if

83

the defendant's relationship to the victim's loss is through a crime of which the jury acquitted the defendant, which is equally true when the defendant is not charged with the crime. (*Id.* at p. 1050, fn. 3.) Respondent cites *People v. Carbajal* (1995) 10 Cal.4th 1114, but that case addresses restitution as a condition of probation, and courts have "a much freer hand" to impose restitution as a probation condition: "The scope of the court's duty—and power—to order restitution turns on whether the court imposes judgment or instead places the defendant on probation. When judgment is imposed and the defendant sentenced to a period of incarceration (in prison or jail), the court may order restitution only for losses arising out of the 'criminal conduct for which the defendant has been convicted.' " (*People v. Walker* (2014) 231 Cal.App.4th 1270, 1274.)

The portion of the restitution order requiring Alphonso and James to pay restitution related to the Riverside Diamond Wireless robbery on April 25 (counts 2 and 3) and the Fontana Diamond Wireless robbery on May 8 (counts 4, 5, and 6) must be stricken.

### C.   *Joint and several liability*

Respondent concedes that the abstracts of judgment for Jarrod, Alphonso, and James should be modified to reflect joint and several liability for the restitution orders. (*People v. Blackburn* (1999) 72 Cal.App.4th 1520, 1535.) This excludes Jonathan. The prosecution withdrew its request for a restitution hearing as to Jonathan, and he was not ordered to pay restitution.

84

## DISPOSITION

Jarrod Williams's convictions on counts 4, 7, 13, 16, 18, 20, and 25 are reversed. The judgment is modified to stay, pursuant to Penal Code section 654, Jarrod Williams's sentences on count 2 and 10. The restitution order shall be modified to state Diamond Wireless as the recipient of restitution for the April 25, 2012 robbery on count 3.

The judgment is modified to stay, pursuant to Penal Code section 654, Alphonso Williams's sentences on counts 7, 10, 13, 16, 18, and 20. The portion of the restitution order requiring Alphonso Williams to pay restitution in counts 2, 3, 4, 5, and 6 is ordered stricken.

James Wilson's convictions on counts 7, 13, 15, 16, 18, and 20 are reversed. The judgment is modified to stay, pursuant to Penal Code section 654, James Wilson's sentence on count 10. The portion of the restitution order requiring James Wilson to pay restitution in counts 2, 3, 4, 5, and 6 is ordered stricken.

Jonathan Wilson's convictions on counts 16, 18, and 20 are reversed.

The abstracts of judgment for Jarrod Williams, Alphonso Williams, and James Wilson shall be modified to reflect joint and several liability for restitution.

85

The trial court shall amend the abstract of judgment accordingly, and forward the amended abstract of judgment to the California Department of Corrections and Rehabilitation.

In all other respects, the judgments are affirmed.

CERTIFIED FOR PUBLICATION.


JOHNSON, J.


We concur:


ROTHSCHILD, P. J.


LUI, J.