Filed 12/30/20  P. v. Lewis CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>CARL LEWIS et al.,<br><br>        Defendants and Appellants. | B297167<br><br>(Los Angeles County<br>Super. Ct. No. PA089846) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Cynthia L. Ulfig, Judge.  Affirmed as modified with directions as to defendant Lewis; remanded for resentencing as to defendant Ford.

James M. Crawford, under appointment by the Court of Appeal, for Defendant and Appellant Carl Lewis.

Cynthia L. Barnes for Defendant and Appellant Kewain Ford.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior

Assistant Attorney General, Steven D. Matthews and J. Michael Lehmann, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Defendants and appellants Carl Lewis and Kewain Ford appeal their convictions for robbery and related offenses arising from two robberies at Walgreens pharmacies.  Defendants raise three issues:  (1) insufficient evidence that Lewis kidnapped one of the pharmacists (specifically, the asportation element); (2) insufficient evidence of the gang enhancement; and (3) error in instructing with CALCRIM No. 361, on a defendant's failure to explain or deny adverse testimony.  We asked the parties to submit letter briefing on two additional issues:  (4) whether part of each of defendants' sentences must be stayed pursuant to Penal Code section 654; and (5) whether certain firearm and gang enhancements imposed and stayed on Ford's false imprisonment counts must be stricken or modified.[1]  We modify Lewis's sentence, remand for resentencing Ford, and otherwise affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

1. *The Offenses*

On Halloween night 2017, defendants – both members of the Pacoima Piru Bloods gang – intended to rob a Walgreens pharmacy to obtain Oxycodone and other prescription drugs for personal use and resale on the street.  Although the first robbery was successful, defendants discovered they had obtained the

_____

[1]     All undesignated statutory references are to the Penal Code.

2

wrong drugs, so they robbed a second Walgreens that night. Defendants were arrested fleeing the scene of the second robbery.

### A. *The First Robbery – Sherman Way*

The first robbery was committed at the Sherman Way Walgreens. Lewis wore a "Scream" Halloween costume; Ford wore a "Scream" mask without the full robe.[2] First Ford, then Lewis, leapt over the pharmacy counter at the Walgreens. Ford flashed a gun at the pharmacist, T.K. Lewis asked T.K. where the "good stuff" was kept; T.K. rightly inferred that the men wanted narcotics.

Walgreens pharmacies keep their narcotics in a safe in the back. The safe has four quadrants; each quadrant requires a key, but one quadrant has a time delay on the lock for extra security. The narcotics which are highly abused and highly addictive – and therefore, commonly stolen – are kept in the time-delayed quadrant in order to deter theft. When Lewis asked for the "good stuff," T.K. walked back to the safe, followed by Lewis. He told her to open the safe. T.K. immediately opened one quadrant of the safe – not the time-delayed quadrant containing the narcotics. Lewis swept the medications off the safe shelves into his bag. Both defendants fled.[3]

After they drove away from the Walgreens, Lewis pulled the car over to review their take. He was disheartened to learn that it was all useless medication, "Adderall, Ritalin, nothing basically that you can get high off of or sell." Defendants chose to

---

[2] Lewis testified that he had shoplifted both costumes from the 99 Cents Store earlier that day.

[3] In the first robbery, defendants hired a lookout who Lewis said was not a gang member. He also fled.

commit a second robbery.  Lewis dumped the drugs, and the
"Scream" costumes, in the trash.

**B.**     *The Second Robbery - Woodman*

The second robbery took place at the Woodman Avenue
Walgreens.  Defendants' tactics were virtually identical to that of
the first robbery.  Wearing Halloween masks, the robbers entered
the Walgreens.  Ford and Lewis jumped over different counters to
enter the pharmacy from both sides.  When customers waiting
outside the pharmacy saw this, they fled, leaving the area outside
the pharmacy deserted.  Ford flashed a gun.  Lewis demanded
Oxycodone from a pharmacist named T.L.  T.L. felt an object
touch her back; she thought it was a gun, although the jury found
it was not.  Lewis walked T.L. toward the drug safe.  T.L.
estimated the distance to be 15 to 20 feet; video shows Lewis
walking T.L. past at least five pharmacy aisles.  T.L. put her key
in the time-delayed lock, which started counting up to three
minutes.  T.L. explained to Lewis that they had to wait for the
three minutes before the safe would open.  Lewis kept telling her
to hurry up and open the safe; T.L. said she could do nothing
until the clock ran.

While Lewis was with T.L. at the safe, Ford gathered the
other pharmacy employees to another part of the pharmacy, and
directed them to look away.  Ford stood for a time with T.L. and
Lewis at the safe; then he leapt back over the counter to keep
watch – he could see T.L. and the other employees from this
location, and also watch the area around the pharmacy to see if
anyone was coming to assist the victims.  Pharmacist T.L. was
isolated at the safe; she could not see her fellow employees and
they could not see her.  Nor could she see out the consultation
window into the rest of the Walgreens.  To the extent she could

4

lean back to see the consultation window, she saw only Ford standing just beyond it, saying to hurry up. T.L. did not consider escaping; she thought it too dangerous, so she just kept her hands up and waited for the robbery to be over.

After the three minutes elapsed, T.L. had to use her key a second time to open the safe. Lewis grabbed everything he could and defendants sprinted away.

### C. *The Arrest*

It is not clear who first alerted police to the second robbery at the Woodman Walgreens, but the three-minute time-delay on the safe may have given the authorities the head start they needed. By the time a police car arrived on the scene, a police helicopter was already overhead, and passersby directed police in the direction of defendants' fleeing vehicle. After a brief pursuit, defendants exited their car and attempted to disappear into a residential neighborhood where children were trick-or-treating. Both defendants were captured on foot. As Ford was arrested, he dropped the mask he had used in the Woodman robbery. The car defendants had used was registered to Lewis. Lewis's mask and the stolen drugs from the Woodman robbery were found in the car, as well as Lewis's cell phone. The street value of the stolen drugs, which included over 4000 pills, was estimated to be $40,000-$50,000.

### D. *The Planned Drug Sales Would Have Benefitted the Gang*

It was undisputed that the purpose of the robberies was to obtain drugs for sale. One of the issues at trial was whether those anticipated drug sales would have benefitted defendants' gang or whether, as Lewis attempted to argue, they were simply for his own economic gain.

Lewis testified at trial. He admitted that he had a history of drug sales. Indeed, drug sales were his source of income for most of his adult life. Lewis also admitted that he had been jumped into the Pacoima Piru Bloods at age 18 and had a gang moniker. Although Lewis conceded that he was never jumped out, he claimed that he had left the gang at age 36, some 12 years earlier, and had simply stopped associating with the gang. Lewis testified that none of his drug sales were ever part of his gang membership.

LAPD Officer Jeff Rood, the prosecution's gang expert on the Pacoima Piru Bloods, testified that one of the gang's primary activities is the sale of narcotics. He explained that robberies and drug sales support the gang financially, by bringing in money, which can be used to buy more drugs or firearms. Drug sales also fund the gang members' lives, so that they need not have regular jobs. Officer Rood testified, in response to a hypothetical based on the facts of this case, that the robberies were for the benefit of the gang because gang members would get money from the anticipated drug sales. He also believed the robberies would have promoted the gang "as being the guys who have the best narcotics on the street, the best narcotics that they can sell, meaning prescription. They will get a lot more clients than just clients of individuals who use just common street drugs." In response to a hypothetical positing that two Pacoima Piru members robbed a pharmacy, got away with it, sold the drugs, and made a profit they did not share with anyone else, Officer Rood testified this would nonetheless benefit the gang because, "[w]hen they sell the drugs, they are selling the drugs as Pacoima Piru gang members, as drug dealers representing Pacoima Piru. It allows the neighborhood and users, other gangs[,] to know that.

6

[¶]  The Pacoima Piru Bloods can get narcotics, whatever may be, and sell it and get rid of it fast because they get the good stuff or whatever it may be.  Their goal is to get clients hooked, to get the community hooked and get that community coming back, because that is a consistent flow of money, like I said meth, heroin[], prescription pills, opioids, stuff of that nature."

Officer Rood added that if someone sells drugs in a gang's territory, the gang must approve it and there has to be some benefit to the gang for that to occur.  If it is not approved by the gang, there will be severe consequences, including the possibility of death.

As to whether Lewis had, in fact, stopped associating with the gang, his cell phone included "selfie" photographs of himself throwing gang signs commonly associated with the gang.  On October 1, 2017 – just a month before these robberies, Lewis was in attendance at a softball game between the Pacoima Pirus and another Blood set.  At trial, Lewis admitted attending the game, but explained that it was an anti-violence softball game; he clarified that he had not stopped associating with his friends in the gang, he simply was no longer participating in "violent negativity actions."

As to whether Lewis sold drugs on behalf of the gang, his phone included a text message exchange in which someone commenced conversation with him by stating, "What up [P]iru?" and Lewis responded.  In the course of the conversation, the other person asked Lewis about his ability to obtain drugs, to which Lewis responded affirmatively.[4]  Lewis agreed that people still

---

[4]     Specifically, the person asked defendant, "Aye kan you still get yo hands on dat black for $650[?]"  The gang expert explained that "black" referred to heroin, and the use of "k" for "c" (as in the

7

know him by his gang moniker, and that they use gang "lingo" with him, which he uses back to them. Although he claimed to have left the gang, he did not make an effort to inform people of his real name.

## 2. *The Charges*

The prosecution originally sought to proceed against defendants for the robbery and aggravated kidnapping of both pharmacists – T.K. and T.L. At the preliminary hearing, the court concluded the evidence of movement was insufficient to support aggravated kidnapping and reduced the charge to simple kidnapping in both instances.

Defendants were both charged by amended information with the robbery (§ 211) and kidnapping (§ 207, subd. (a)) of both T.K. and T.L. With respect to each offense, a firearm enhancement (§ 12022.53, subd. (b)) and gang enhancement (§ 186.22, subd. (b)(1)(C)) were also alleged with respect to each defendant.

## 3. *The Verdicts*

The trial court asked the parties whether they wanted instruction on any lesser included offenses. Ford requested instruction on false imprisonment; Lewis did not want such instruction. The trial court complied, instructing on the lesser of felony false imprisonment only as to Ford.[5]

---

word "can") is common for Piru members who avoided the letter "c" as is "Crips." Defendant responded to the text with a negotiation: "750$.. and got some China White." China White is a designer form of synthetic heroin.

[5] The jury was not instructed on accomplice liability. It was instructed in the language of CALCRIM No. 203 to "separately consider the evidence as it applies to each defendant."

The jury returned the following verdicts:  As to Ford, he was found guilty of both robberies, with the firearm and gang enhancements true.  He was found not guilty of both kidnappings, but guilty of both false imprisonments, again with the firearm and gang enhancements true.  As to Lewis, he was found guilty of both robberies, with the gang enhancement, but not the firearm enhancement, true.  He was acquitted of kidnapping T.K., but convicted of kidnapping T.L., with the gang enhancement true.

4.    *Sentencing*

Ford was sentenced to 25 years in prison, calculated as the high term of 5 years for the first robbery, plus 10 years for the firearm enhancement, plus 10 years for the gang enhancement.  Concurrent terms were imposed on the remaining counts; enhancements on those counts were imposed and stayed.

Lewis was sentenced to 26 years, 8 months in prison, calculated as follows:  For the T.L. kidnapping, the high term of 8 years, plus 10 years for the gang enhancement.  For each of the two robberies, a consecutive term of 4 years, four months, calculated as one-third the midterm of 3 years, plus one-third the enhancement term of 10 years.[6]

---

[6]    Although Lewis's abstract of judgment mathematically adds the consecutive terms in the total sentence, the box is checked for these terms to be "concurrent."  As we modify Lewis's sentence and direct preparation of a new abstract, we also direct the trial court to correct the abstract to reflect consecutive sentences for Lewis.

## *DISCUSSION*

**1.** *Sufficiency of the Evidence of Asportation of T.L.*

Lewis argues there is insufficient evidence that he kidnapped T.L., specifically, as to the element of asportation.

When a defendant questions the sufficiency of the evidence, we are required "to review the record ' " 'in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt.' " [Citations.]' [Citation.]" (*People v. Arias* (2011) 193 Cal.App.4th 1428, 1434.)

There is a distinction between the asportation requirement for aggravated kidnapping (e.g., kidnapping for the purpose of robbery under section 209, subdivision (b)) and the asportation requirement for simple kidnapping, even when the simple kidnapping is in the course of a robbery.

Specifically, the asportation element for aggravated kidnapping requires movement of the victim that *both* (1) is not merely incidental to the robbery; and (2) increases the risk of harm to the victim over and above the harm necessarily present in the robbery. (*People v. Williams* (2017) 7 Cal.App.5th 644, 667 (*Williams*); *People v. Shadden* (2001) 93 Cal.App.4th 164, 168 [similar test for kidnapping for rape].)

The asportation element of simple kidnapping requires only that the movement be substantial in character. However, there is no specific minimum distance which must be met for the movement to be substantial. (*People v. Singh* (2019) 42 Cal.App.5th 175, 187–188 [movement of a victim a mere ten feet is substantial, when the victim is a helpless child and the movement takes the child away from his mother who is standing

10

in a bus ready to depart].)  In determining whether the movement is substantial, the trier of fact may consider more than actual distance.  (*People v. Martinez* (1999) 20 Cal.4th 225, 235.)  As was the case here, the jury is to be instructed to consider the totality of the circumstances in determining whether the movement is substantial.  (*Id.* at p. 237.)  Some of the factors a jury may consider, in addition to the actual distance, are whether the movement increased the risk of harm above that which existed prior to the asportation, decreased the likelihood of detection, and increased the danger inherent in a victim's foreseeable attempts to escape and the attacker's enhanced opportunity to commit additional crimes.  (*Ibid.*)  "[I]n a case involving an associated crime, the jury should be instructed to consider whether the distance a victim was moved was incidental to the commission of that crime in determining the movement's substantiality."  (*Ibid.*)  We emphasize our Supreme Court's language here:  kidnapping for robbery *requires* that the distance moved not be merely incidental to the commission of the robbery; but for simple kidnapping, whether the movement is merely incidental to the robbery is only one of several factors the jury is to *consider* in its overall determination of whether the movement is *substantial*.

Here, considering the totality of the circumstances, the jury found the movement of T.L. substantial.  This conclusion is supported by sufficient evidence.  Lewis moved T.L. 15 to 20 feet, from the front of the pharmacy where she was with her fellow employees, to the back where she was isolated from view – able to see only Lewis and his armed accomplice.  The defendants kept her separated from the others at this spot for three minutes while waiting for the safe to open, during which time both defendants

11

urged T.L. to hurry – a process over which she had no control. This increased the risk of harm to T.L. and the defendants' opportunity to commit additional crimes. There was a risk that the defendants would take out their frustrations at the time delay on T.L., and there was no one to whom she could turn for assistance. (See *Arias, supra*, 193 Cal.App.4th at pp. 1430, 1435 [simple kidnapping asportation established when defendant forced the victim to walk 15 feet, at gunpoint, from outside to an indoor location, increasing risk].)

Lewis disagrees, relying primarily on authority holding that robbery is not elevated to aggravated kidnapping merely because the robber moves the victim inside the premises to the location where the valuables are held. (*Williams, supra*, 7 Cal.App.5th at p. 669.) But this is a case of simple kidnapping, in which the totality of the circumstances analysis applies. In any event, we find the additional circumstance of keeping T.L. trapped at the safe while waiting for the time-delay renders this case distinguishable.[7]

## 2.      *Sufficiency of the Evidence of the Gang Enhancement*

Both defendants argue the evidence is insufficient to establish the gang enhancement. Specifically, they deny that substantial evidence supported the finding that the crimes were committed "for the benefit of, at the direction of, or in association

---

[7]      Lewis relies on *Williams, supra*, 7 Cal.App.5th at p. 644 to suggest that if the movement is only incidental to the robbery, defendant cannot be convicted of simple kidnapping. To the extent that is the holding in *Williams*, we respectfully disagree with it. As for Lewis's contention that, because *Williams* was a Second District case, we are obligated to follow it, he is wrong. (*Gonzalez v. Lew* (2018) 20 Cal.App.5th 155, 166, fn. 7 ["[t]here is no horizontal stare decisis in the California Court[s] of Appeal"].)

with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." (§ 186.22, subd. (b)(1).) Defendants argue that they committed the robberies and kidnapping to obtain drugs for personal use and personal sale – not in association with or to benefit the gang.[8]

There are two elements here. The first is that the offense be committed "for the benefit of, at the direction of, or in association with any criminal street gang." The second is that the offense be committed "with the specific intent to promote, further, or assist in any criminal conduct by gang members." (§ 186.22, subd. (b)(1).) We address the two elements separately.

### A. *"For the benefit of, at the direction of, or in association with any criminal street gang"*

Before considering the evidence of the first element, we have one preliminary observation. The association/direction/ benefit alternative is in the disjunctive. "The crucial element, however, requires that the crime be committed (1) for the benefit of, (2) at the direction of, *or* (3) in *association* with a gang." (*People v. Morales* (2003) 112 Cal.App.4th 1176, 1198.) In *People v. Albillar* (2010) 51 Cal.4th 47, 59, our Supreme Court

---

[8] Lewis specifically focuses his argument on the T.L. kidnapping, suggesting that there was no evidence that the kidnapping itself was gang-related. The evidence was that Lewis kidnapped T.L. in order to obtain the narcotics from the safe. In other words, when considering defendants' purposes in committing these offenses, their intent was the same for all of the crimes.

13

considered the association and benefit alternatives separately, as do we.[9]

The prosecution gang expert, Officer Rood, was asked to consider a lengthy hypothetical mirroring the facts of this case. The prosecutor then asked if Officer Rood had an opinion whether the crimes in the hypothetical were "for the benefit or in association with the Pacoima Piru Bloods street gang." The officer's initial answer addressed both alternatives. "The association, meaning the multiple gang members committing crimes together. The benefit is financially, they are going to benefit from the theft of the narcotics in which they will be able to sell that, turn around and get money to benefit the gang to buy more narcotics and more weapons, to commit more crimes against other gang members, community members, to continue to instill fear upon the community in which they claim territory to."

We consider first whether substantial evidence supported the "benefit of the gang" alternative. Defendant Lewis testified at trial that he had a history of selling drugs but denied that his sales were gang-related. Officer Rood saw the connection. Later in his testimony, he said that the sale of drugs was one of the Piru Bloods's primary activities. Sales benefitted the gang financially because they enabled the gang to buy weapons and more drugs. Drug money funded the gang members' lifestyles so they had the freedom to commit other crimes. Officer Rood also testified that other gang members would get money from anticipated sales. Even if drug money were not shared with

---

[9]     The court's discussion of the association element was at 51 Cal.4th at pages 60-63; the discussion of the benefit to the gang was at pages 63-64. Neither the Supreme Court nor the parties here discuss separately the "direction" alternative.

14

other gang members, the gang would benefit from the present robberies because members would be known as "the guys who have the best narcotics on the street, the best narcotics that they can sell, meaning prescription." Piru Bloods had "the good stuff," which distinguished Piru Bloods from other gangs that only sold street drugs. The prescription drugs could be sold more quickly.

According to Officer Rood, Lewis's personal involvement in drug sales that benefitted the gang could be seen in a series of phone text messages to and from Lewis. In one text, someone asked Lewis, "What's up Piru?" and Lewis responded. The other person then asked Lewis about his ability to obtain drugs. Lewis responded affirmatively using a code adopted by the Piru Bloods that had a derogatory reference to a rival gang.[10] We conclude substantial evidence supported the "for the benefit" alternative in section 186.22, subdivision (b)(1).

Because the "benefit" and "association" alternatives are in the disjunctive, we briefly discuss the evidence that the robberies were committed in association with other gang members. To establish the association alternative, the defendants' conduct must "exceed[] that which was necessary to establish that the offenses were committed in concert." (*People v. Albillar, supra,* 51 Cal.4th at p. 61.) Officer Rood acknowledged that not every crime committed by multiple gang members is committed in association with the gang. Here, there was evidence that Ford and Lewis had a friendship and possibly were related, suggesting the robberies were for personal gain.[11] In contrast, Officer Rood

[10] See footnote 3 above.

[11] During his testimony, Lewis referred to Ford as "[m]y crimie."

15

testified: "If you are using more than one gang member you are obviously using because you trust your fellow gang members which is why you are committing the crime with them, not choosing to do it by yourself or do it with just anyone. You have chosen your fellow gang members because you trust them because they are part of your neighborhood, they are part of someone you know is down because they have earned their name and moniker, they are willing to commit crimes to benefit the gang."

Although we find this evidence is weaker than Officer Rood's testimony about these crimes benefitting the gang, the totality of his testimony is substantial evidence of the benefit/direction/association element of section 186.22, subdivision (b)(1).

B.  ***"With the specific intent to promote, further, or assist in any criminal conduct by gang members"***

We find the second element of section 186.22(b)(1) — "with the specific intent to promote, further, or assist in any criminal conduct by gang members" – was also supported by substantial evidence. This element does not require evidence of a specific intent to assist the gang, only the specific intent to promote criminal conduct by gang members. In *People v. Albillar, supra*, 51 Cal.4th at p. 68, the court held that "if substantial evidence establishes that the defendant intended to and did commit the charged felony with known members of a gang, the jury may fairly infer that the defendant had the specific intent to promote, further, or assist criminal conduct by those gang members." The same inference is more compelling in those situations, such as this one, in which two gang members commit crimes not only in

16

association with, but also for the benefit, of the gang. We conclude the same evidence that demonstrated the crimes benefitted the gang also supported the intent to promote the criminal conduct of gang members.[12]

### 3. *Any Error in Giving CALCRIM No. 361 Was Harmless*

After Lewis testified, the trial court instructed the jury in the language of CALCRIM No. 361 as follows: "If the defendant failed in his testimony to explain or deny evidence against him, and if he could reasonably be expected to have done so based on what he knew, you may consider his failure to explain or deny in evaluating that evidence. Any such failure is not enough by itself to prove guilt. [¶] The People must still prove the defendant guilty beyond a reasonable doubt. If the defendant failed to explain or deny, it is up to you to decide the meaning and importance of that failure."

As the late Justice Donald Gates wrote of CALCRIM No. 361's predecessor, CALJIC No. 2.62, "We heartily agree that in light of the hostile reception this instruction has received of

---

[12] We find the present case is distinguishable from *In re Daniel C.* (2011) 195 Cal.App.4th 1350, on which Lewis relies. In *Daniel C.*, the defendant intended to shoplift a bottle of liquor, but ended up committing a robbery when the store's assistant manager tried to stop him. (*Id.* at p. 1353.) Defendant had acted alone, although his companions were waiting outside. (*Ibid.*) On appeal, the court rejected the notion "that stealing a bottle of liquor to drink with companions is, in itself, sufficient to support a conclusion that the theft was intended to promote, further or assist criminal conduct by gang members." (*Id.* at p. 1364.) In the present case, defendants were not acting alone to obtain something for personal use; they were acting together to obtain something for resale in the name of the gang and in furtherance of the gang's reputation in the community.

17

late from legal logicians and semanticists [citations], it will always be unwise of a trial court to include it among its general instructions without prior inquiry of the parties concerning it. In fact, today it should not even be requested by either side unless there is some specific and significant defense omission that the prosecution wishes to stress or the defense wishes to mitigate. In the typical case it will add nothing of substance to the store of knowledge possessed by a juror of average intelligence. Furthermore, if its terms are adhered to, as presumably they will be, its message will be essentially irrelevant in the absence of some designated glaring hiatus in the defendant's testimony. In such an instance, of course, this lacuna will presumably be the subject of debate and emphasis during the parties' arguments to the jury, with or without the neutral guidelines contained in this recently disfavored instruction." (*People v. Haynes* (1983) 148 Cal.App.3d 1117, 1119–1120.)

Yet, the erroneous use of the predecessor instruction was routinely found to be harmless, largely because the instruction itself contains limiting language. (*People v. Lamer* (2003) 110 Cal.App.4th 1463, 1472.) It does not direct the jury to draw an adverse inference; it expressly applies only if the jury finds a failure to explain or deny evidence. It further cautions that failure to explain or deny does not create a presumption of guilt or otherwise relieve the prosecution of its burden. (*Ibid.*)

We review claims of instructional error de novo. (*People v. Grandberry* (2019) 35 Cal.App.5th 599, 604.) The task of a reviewing court examining a claim that CALCRIM No. 361 was erroneously given is to ascertain if the defendant failed to explain or deny any fact or evidence which was within the scope of relevant cross-examination and was within the defendant's

18

knowledge which he did not explain or deny. (*Id.* at p. 606.) The focus is not on what was adduced during cross-examination, but on what could have been asked of the defendant in light of the evidence presented in the prosecution's case-in-chief and the defendant's own testimony. (*Id.* at p. 608.) If giving the instruction was error, the harmlessness standard of *People v. Watson* (1956) 46 Cal.2d 818, 836, applies. We consider whether it is reasonably probable that a result more favorable to the defendant would have been reached in the absence of the error. (*People v. Lamer, supra*, 110 Cal.App.4th at pp. 1471–1472.)

Here, at the jury instruction conference prior to Lewis's decision to testify, the court deferred a decision on CALCRIM No. 361 until after Lewis made his decision. After Lewis testified, however, there was no further discussion of whether CALCRIM No. 361 would be given.

We find it unnecessary to pore through the record for testimony that Lewis did not explain or deny. Instead, for sake of discussion, we will assume error and conclude it was harmless. Lewis admitted committing the robberies, and his conduct during the crimes was captured on video from the pharmacies. The jury evaluated the videos and the testimony and reasonably concluded that while Lewis kidnapped T.L. (at the second pharmacy) he did not kidnap T.K. (at the first). As to Lewis's gang involvement, although he claimed to have left the gang, the undisputed evidence was that he still associated with gang members, still used his gang moniker, and still used gang language – even in the course of conducting his drug dealing operations. While the prosecutor rightly questioned the logic of Lewis's testimony in argument to the jury, the prosecution did not call attention to this instruction or the inference it allowed. The jury was

19

instructed in the language of CALCRIM No. 200 that some of the instructions may not apply, and that it should only use those instructions which apply based on the facts it finds. There is no reasonable probability that the jury would have reached a different verdict in the absence of this unemphasized instruction.

Lewis's contrary arguments do not persuade us: "The logical inference from this instruction being included was that Lewis was being either dishonest or evasive in trial, with the result being that the jury did not believe Lewis's claims that he was committing the robberies to furnish his personal drug habit and pay personal expenses." Lewis's suggestion that the mere inclusion of the instruction informed the jury that he must have been either dishonest or evasive goes against the express language of both CALCRIM No. 200 and the instruction itself. The instruction simply permits an adverse inference if the jury finds the necessary prerequisite of a failure to explain or deny. The jury disbelieved Lewis not because of the perhaps erroneous inclusion of a facially inapplicable instruction, but because his testimony was inherently not worthy of belief.

4.    *Defendants' Sentences Must Be Modified Under Section 654*

Section 654 prohibits multiple punishments for the same act. Further, it bars multiple punishment for separate offenses arising out of a single occurrence where all of the offenses were incidental to one objective. (*Williams, supra*, 7 Cal.App.5th at p. 695.) We sought additional briefing on the application of section 654 to this case. Defendants argued, the prosecution concurred, and we agree to the following modifications:

Lewis was sentenced to a principal term for the kidnapping of T.L. (count 4), with a consecutive subordinate term for, among

20

other things, the robbery of T.L. (count 3).  Where the kidnapping effectuates the robbery, the robbery sentence must be stayed under section 654 pending completion of the sentence for kidnapping the same victim.  (See *People v. Eddahbi* (1988) 199 Cal.App.3d 1135, 1143.)

Similarly, Ford was sentenced to a principal term for the robbery of T.K. (count 1) with concurrent terms for the false imprisonment of T.K. (count 2) and the robbery of T.L. and false imprisonment of T.L. (counts 3 and 4).  As the robbery and false imprisonment of each victim were part of an indivisible course of conduct committed pursuant to a single objective, the false imprisonment terms must be stayed pending completion of the sentences for the related robberies.  (*People v. Williams, supra*, 7 Cal.App.5th at p. 695.)

5.  ***Issues Related to Defendant Ford's Sentence and Enhancements for False Imprisonment***

Ford received concurrent terms for the two counts of false imprisonment, which, as discussed above, must be stayed.  For each false imprisonment count, a 10-year enhancement for personal use of a firearm (§ 12022.53, subd. (b)) and an additional 10-year gang enhancement (§ 186.22, subd. (b)(1)(C)) were imposed and stayed.

As to the firearm enhancement, section 12022.53, subdivision (b) provides a 10-year sentence enhancement for the personal use of a firearm in the commission of a felony enumerated in subdivision (a).  While kidnapping and robbery are so enumerated (§ 12022.53, subds. (a)(3), (a)(4)), false

21

imprisonment is not.  The firearm enhancements on Ford's two false imprisonment counts must be stricken.

The section 186.22, subdivision (b) gang enhancement applies to any felony.  However, it imposes a different term depending on whether the offense is a felony, serious felony, or violent felony.  The trial court imposed and stayed 10 years, which is the term for a violent felony.  (§ 186.22, subd. (b)(1)(C).)  False imprisonment is not included in the list of violent felonies.  (§ 667.5, subd. (c).)  The prosecution does not argue that the false imprisonments in this case were serious felonies.  The appropriate term is therefore two, three, or four years, at the court's discretion.  (§ 186.22, subd. (b)(1)(A).)  We therefore remand for the trial court to exercise its sentencing discretion on this issue.

### *DISPOSITION*

As to defendant Lewis, the judgment is modified as follows: the consecutive sentence imposed on count 3, and its related gang enhancement, shall be stayed pursuant to section 654. The trial court is directed to prepare a new abstract of judgment reflecting these changes and that Lewis's sentence was consecutive, not concurrent. The clerk shall forward the new abstract to the Department of Corrections. As modified, the judgment is affirmed.

As to defendant Ford, the concurrent terms imposed on counts 2 and 4 shall be stayed pursuant to section 654. The firearm enhancements, on counts 2 and 4, on which sentence had already been stayed, shall be stricken. The matter is remanded for the trial court to exercise its discretion as to the term to be imposed and stayed for the gang enhancement. The judgment is otherwise affirmed.


RUBIN, P. J.

WE CONCUR:



BAKER, J.



KIM, J.


23